COMMONWEALTH EDISON COMPANY, Petitioner-Appellant, v. ILLINOIS COMMERCE COMMISSION, Respondent-Appellee (The People of the State of Illinois *et al.*, Intervenors).

Second District   Nos. 2—00—0375, 2—00—0275 cons.

Opinion filed June 6, 2001.

Paul F. Hanzlik, John L. Rogers, John P. Ratnaswamy, and E. Glenn Rippie, all of Foley & Lardner, and Rebecca J. Lauer and Thomas J. Russell, both of Commonwealth Edison Company, both of Chicago, for petitioner.

John P. Kelliher, Special Assistant Attorney General, of Chicago, for respondent Illinois Commerce Commission.

David I. Fein and Christopher J. Townsend, both of Piper, Marbury, Rudnick & Wolfe, of Chicago, for respondent Enron Energy Services, Inc.

James Hinchliff, Gerard T. Fox, Mary Klyasheff, and Timothy P. Walsh, all of Chicago, for respondent Peoples Energy Service Corporation.

JUSTICE CALLUM delivered the opinion of the court:

Petitioner, Commonwealth Edison Company (ComEd), appeals directly to this court from an order of respondent, the Illinois Commerce Commission (the Commission). This order approves, with modification, ComEd's proposed open-access implementation plan and delivery service tariffs. On appeal, ComEd argues that the order unlawfully prevents ComEd from fully recovering its open-access implementation costs and delivery services costs. We affirm in part, reverse in part, and remand.

## BACKGROUND

This appeal arises under Article XVI of the Public Utilities Act (220 ILCS 5/1—101 *et seq.* (West 1998)). Titled the Electric Service Customer Choice and Rate Relief Law of 1997 (Customer Choice Law) (220 ILCS 5/16—101 *et seq.* (West 1998)), it introduced competition for the first time into the Illinois electricity market. The parties refer to this competitive market structure as "open access."

Under the traditional model of the retail electricity market, a retail customer purchases several different services from its local electric utility as a single "bundled" service. Bundled service includes the electricity itself, as well as all services related to the distribution and delivery of electricity. Under the Customer Choice Law, by contrast, a retail customer eligible for open access may choose either to continue purchasing bundled service from its local electric utility or to purchase electricity as a separate "unbundled" service from one of three new types of suppliers. Unbundled service is available for purchase from (1) alternative retail electric suppliers, which are non-utilities licensed to sell retail electricity; (2) an Illinois electric utility other than the customer's local electric utility; or (3) the customer's local electric utility, which may sell electricity on both a bundled and unbundled basis. Any supplier other than the customer's local electric utility is known as a "retail electric supplier" (RES). However, even if a retail customer chooses to purchase its electricity on an unbundled basis from a supplier other than its local electric utility, the local electric utility continues to supply that customer's "delivery services," which the Customer Choice Law defines as:

> "those services provided by the electric utility that are necessary in order for the transmission and distribution systems to function so that retail customers located in the electric utility's service area can receive electric power and energy from suppliers other than the electric utility, and shall include, without limitation, standard metering and billing services." 220 ILCS 5/16—102 (West 1998).

■ Under section 16—108 of the Customer Choice Law, a utility is required to file a delivery services tariff (DST) with the Commission at least 210 days prior to the date on which the utility is to begin supplying such services. 220 ILCS 5/16—108(a) (West 1998). A tariff specifies both the customers that are eligible for a particular regulated service and the terms and conditions, including the price, under which a utility is to provide such service. The Commission is then required to enter an order approving or approving as modified the utility's DST no later than 30 days prior to the date on which the utility is to begin supplying such services. 220 ILCS 5/16—108(b) (West 1998). Charges for delivery services are to be "cost based, and shall allow the electric

utility to recover the costs of providing delivery services." 220 ILCS 5/16—108(c) (West 1998). In addition, such charges are to be "just and reasonable and shall take into account customer impacts." 220 ILCS 5/16—108(d) (West 1998). In establishing the rates that a public utility is to charge its customers, the Commission considers the company's operating costs, rate base, and allowed rate of return. *Citizens Utility Co. v. Illinois Commerce Comm'n*, 124 Ill. 2d 195, 200 (1988). A public utility is entitled both to recover in its rates certain operating costs and to earn a return on its rate base (*i.e.*, the amount of its invested capital). *Citizens Utility Co.*, 124 Ill. 2d at 200. The return is the product of the allowed rate of return and the rate base. *Citizens Utility Co.*, 124 Ill. 2d at 200. The sum of those amounts—operating costs and return on rate base—is known as the company's revenue requirement. *Citizens Utility Co.*, 124 Ill. 2d at 200.

This action relates to ComEd's DST for the first phase of open access, which began on October 1, 1999. As required by section 16—108, ComEd filed its DST with the Commission on March 1, 1999. On August 26, 1999, the Commission issued its order approving, as modified, ComEd's DST. The Commission later amended that order on September 9, 1999. ComEd filed a petition for rehearing, and the Commission allowed that petition in part and issued an order on rehearing on March 9, 2000. On March 23, 2000, ComEd filed a second petition for rehearing, which the Commission denied on April 4, 2000. This timely appeal followed.

## ANALYSIS

### 1. Standard of Review

■ ■ Our courts give great deference to the Commission's decisions as they are " 'judgment[s] of a tribunal appointed by law and informed by experience.' " *United Cities Gas Co. v. Illinois Commerce Comm'n*, 163 Ill. 2d 1, 12 (1994), quoting *Village of Apple River v. Illinois Commerce Comm'n*, 18 Ill. 2d 518, 523 (1960). When reviewing the Commission's orders, we are limited to considering whether (1) the Commission acted within its authority; (2) adequate findings were made to support the decision; (3) the decision was supported by substantial evidence; and (4) state or federal constitutional rights were infringed. *Citizens United For Responsible Energy Development, Inc. v. Illinois Commerce Comm'n*, 285 Ill. App. 3d 82, 89 (1996). The Commission's factual findings are considered *prima facie* correct and may be reversed only upon a demonstration that the findings are not supported by substantial evidence. 220 ILCS 5/10—201(d), (e)(iv)(A) (West 1998); *People ex rel. Hartigan v. Illinois Commerce Comm'n*, 148 Ill. 2d 348, 367 (1992). When an interpretation of the Commission's

own rules is at issue, the Commission's interpretation is held *prima facie* reasonable (220 ILCS 5/10—201(d) (West 1998); *United Cities Gas Co.*, 163 Ill. 2d at 11), and this court may not interfere unless the administrative construction is clearly erroneous, arbitrary, or unreasonable (*Central Illinois Public Service Co. v. Illinois Commerce Comm'n*, 243 Ill. App. 3d 421, 428 (1993)).

### 2. *Pro Forma* Adjustments

The first issue on appeal is relatively straightforward: did the Commission follow its own rules when rejecting nine *pro forma* adjustments to ComEd's rate base and revenue requirement? We hold that it did not.

The focus of the controversy is section DST.160 of the Commission's "Minimum Information Requirements" (the MIR). Adopted in a separate but related Commission proceeding, the MIR establish the filing requirements for DSTs relating to the first phase of open access. The MIR contemplate the use of a test year in the establishment of appropriate rates and, for the most part, mirror the traditional standard filing requirements established under section 285 of the Illinois Administrative Code (83 Ill. Adm. Code § 285 (1985)).

Here, ComEd determined its delivery services rate base and revenue requirement using 1997 as its historical test year. As permitted by section DST.160, ComEd made certain *pro forma* adjustments to its rate base and revenue requirement. Section DST.160 provides as follows:

> "A utility may propose *pro forma* adjustments (estimated or calculated adjustments made in the same context and format the affected information was provided) to the selected historical test year for all known and measurable changes in the operating results of the test year. These adjustments shall reflect significant changes (changes affecting the ratepayers) in plant investment, operating revenues, expenses and capital structure where such changes occurred during the historical test year or are reasonably certain to occur subsequent to the selected test year but prior to January 1, 2001 and the amount of the changes are determinable. Attrition or inflation factors shall not substitute for a particularized study of individual capital, revenue and expense components. *These adjustments shall be supported by actual expenditures, written contracts, purchase orders, job orders, invoices or other similar evidence of reasonable certainty.* Changes shall not be considered known and measurable simply by virtue of their inclusion in a budget. Any proposed and measurable adjustment to the test year shall be individually identified and individually supported in the direct testimony of the utility. Each adjustment shall be submitted in ac-

cordance with these General Information Requirements' Schedules." (Emphasis added.) *Illinois Commerce Comm'n, On Its Own Motion v. Central Illinois Light Co.*, Interim Order No. 98—0454, app. A, at 6-7 (October 21, 1998).

However, with respect to nine of its *pro forma* adjustments, rather than relying upon actual expenditures, written contracts, purchase orders, job orders, or invoices, ComEd relied almost exclusively upon sworn testimony. Three of these *pro forma* adjustments related to ComEd's delivery services rate base, including (1) $31,446,000 for open-access information systems costs, (2) $1,614,000 for open-access lottery costs, and (3) $120,860,000 for distribution reliability improvement costs. The six remaining *pro forma* adjustments related to ComEd's delivery services revenue requirement, including (1) $7,289,000 for open-access information systems costs, (2) $1,340,000 for open-access lottery costs amortization, (3) $6,886,000 for transmission and distribution business unit costs, (4) $1,984,000 for open-access implementation department costs, (5) $3,859,000 for customer education for open-access costs, and (6) $879,000 for employee training for open-access costs.

In its order approving, as modified, ComEd's DST, the Commission rejected all of the nine *pro forma* adjustments identified above. In rejecting these nine *pro forma* adjustments, the Commission relied heavily—and in most instances exclusively—upon the fact that "ComEd did not provide the support required by DST.160." Specifically, with respect to the three *pro forma* adjustments to ComEd's delivery services rate base, the Commission held that section DST.160 requires all *pro forma* adjustments to be supported by "actual expenditures, written contracts, purchase orders, job orders, invoices or other similar evidence of reasonable certainty." Because "sworn testimony is distinguishable from the preceding language," the Commission concluded that ComEd failed to carry its burden. Similarly, in rejecting the six *pro forma* adjustments to ComEd's delivery services revenue requirement, the Commission accepted the Commission staff's argument that, although ComEd presented sworn testimony in support of all six adjustments, "the support in Edison's case did not meet the requirements of DST.160" and that ComEd therefore "was unable to provide tangible support" for those adjustments.

On appeal, ComEd argues, and we agree, that the Commission erroneously applied section DST.160. A fair reading of the Commission's order clearly reveals that the Commission treated sworn testimony as legally incompetent evidence under DST.160. Indeed, the order contains no indication that the Commission weighed or in any way considered the substance of ComEd's sworn testimony. On the con-

trary, the Commission simply rejected that testimony outright because it was not in the nature of "actual expenditures, written contracts, purchase orders, job orders, invoices or other similar evidence of reasonable certainty." This was error.

Whether sworn testimony constitutes "actual expenditures, written contracts, purchase orders, job orders, invoices or other similar evidence of reasonable certainty" is not the point. Rather, the point is that the MIR explicitly allow the Commission to consider any and all evidence in support of a *pro forma* adjustment. Indeed, although section DST.160 states that *pro forma* adjustments "shall be supported by actual expenditures, written contracts, purchase orders, job orders, invoices or other similar evidence of reasonable certainty," (*Illinois Commerce Comm'n, On Its Own Motion v. Central Illinois Light Co.*, app. A, at 7), section DST.110(b), which sets forth the MIR's purpose, provides:

> "These standard information requirements do not bind the Illinois Commerce Commission *** to a decision based solely on data provided pursuant to this Part. The inclusion of particular information or methodologies in these filing requirements is indicative of the Commission's desire that this information be provided by the time that a utility files its tariffs and implementation plan. *It shall not give rise to a presumption or predetermination that such information or methodologies are more suitable than other information or methodologies. Nothing in these filing requirements shall be construed to mean or imply that the Commission must or will base any determination on, or solely on, the information or methodologies required in these requirements. Neither the utility nor any party to a Commission proceeding is limited by the methodologies or information described in these information requirements in making any request or recommendation to the Commission; and nothing in these information requirements shall be construed to require a utility to base its delivery services tariffs or implementation plan, in whole or in part, on the methodologies or information described in these information requirements and the Schedules referenced herein.* Compliance with these information requirements does not excuse a party from discovery, and parties and Commission Staff may seek additional information through discovery." (Emphasis added.) *Illinois Commerce Comm'n, On Its Own Motion v. Central Illinois Light Co.*, app. A, at 1.

Thus, section DST.110 explicitly states not only that a utility may utilize any information or methodology to support its filing but also that the Commission may base its decision upon any information or methodology, regardless of whether that information or methodology complies with the MIR. Nevertheless, in its order, the Commission

held that it would not consider any evidence that did not comply with section DST.160, for no other reason than that such evidence did not comply with section DST.160.

■ The Commission's categorical rejection of ComEd's sworn testimony was clearly erroneous. Although DST.160 plainly establishes a preference for "actual expenditures, written contracts, purchase orders, job orders, invoices or other similar evidence of reasonable certainty," DST.110 just as plainly permits ComEd to present, and the Commission to consider substantively, sworn testimony as a basis for *pro forma* adjustments. Accordingly, we have no choice but to reverse those portions of the Commission's order rejecting the nine *pro forma* adjustments identified above and to remand this cause to the Commission for the substantive consideration of ComEd's evidence in support of those adjustments. In so ruling, we offer no opinion as to whether ComEd's evidence, when substantively considered, supports any or all of the nine *pro forma* adjustments at issue.

### 3. Single Billing Option Credit

The second issue on appeal relates to the Commission's calculation of the single billing option credit.

■ Under the Customer Choice Law, the local electric utility directly bills the delivery services customer for the utility's charges unless that customer purchases its electricity from an RES and the RES elects the "single billing option" (SBO). See 220 ILCS 5/16—118(b) (West 1998). Under the SBO, the RES sends a single bill to the customer that includes both the RES's charges and the local electric utility's delivery services charges. 220 ILCS 5/16—118(b) (West 1998). As part of its SBO tariff, ComEd proposed a credit of 20 cents per month for each customer whose RES elects the SBO. ComEd arrived at this credit through the use of an "avoided cost" methodology, which, according to ComEd, yields the average cost per customer that ComEd will actually avoid when an RES elects the SBO. In its order, the Commission rejected both ComEd's 20-cents-per-customer SBO credit and ComEd's "avoided cost" methodology, opting instead for an "embedded cost" methodology. According to the Commission, under the "embedded cost" approach, the SBO credit is calculated by dividing the total dollar amount that ComEd included in its revenue requirement for providing billing services to bundled service customers during a given year by the total number of bills actually sent by ComEd during that same year, less any amounts related to ComEd's continuous billing obligation to SBO customers. The Commission's "embedded cost" methodology yields a monthly SBO credit of approximately 55 cents per customer.

On appeal, ComEd argues that the Commission's use of the "embedded cost" methodology for calculating the SBO credit is illegal because it contravenes section 16—108(c)'s mandate that all delivery service charges be "cost based" (220 ILCS 5/16—108(c) (West 1998)). According to ComEd, the only methodology that yields a truly "cost based" credit is ComEd's "avoided cost" methodology. The Commission's "embedded cost" methodology, by contrast, "results in a credit that exceeds the costs that ComEd actually will avoid when [an] RES elects the SBO, at least in the short term, and that provides for no recovery of the denied costs in the long term."

The problem with ComEd's argument is that section 16—108(c) does not define the phrase "cost based." Nor is this a phrase whose meaning is plain on its face. Consequently, the issue becomes one of statutory construction, and, although we are not bound by the Commission's interpretation of a statutory standard, that interpretation is entitled to deference. *Citizens Utility Board v. Illinois Commerce Comm'n*, 291 Ill. App. 3d 300, 304 (1997). Moreover, given the broad delegation of authority to the Commission, this court must rely on the Commission's interpretation of the statute if there is a reasonable debate as to its meaning. *Lakehead Pipeline Co. v. Illinois Commerce Comm'n*, 296 Ill. App. 3d 942, 953 (1998).

■ Here, there is considerable debate as to the meaning of "cost based," and we therefore have no problem deferring to the Commission's conclusion that the "embedded cost" methodology yields an SBO credit that is both "cost based" and compliant with section 16—108(c). Indeed, the issue of whether an "avoided cost" or "embedded cost" methodology generates the truly "cost based" SBO credit was hotly litigated, with expert testimony coming down on both sides. And while ComEd correctly notes that the "embedded cost" methodology fails to account fully for ComEd's short-term costs, the Commission accepted its staff's conclusion that the "embedded cost" methodology is "cost based" in that it reflects ComEd's costs over the long run. Given both the breadth of the phrase "cost based" and the abundant expert testimony supporting the Commission's interpretation of that phrase, we simply cannot say that the Commission's construction of the phrase "cost based" as compatible with an "embedded cost" methodology is erroneous.

Accordingly, we must affirm the Commission's calculation of the SBO credit.

## CONCLUSION

For the foregoing reasons, the order of the Commission is affirmed

in part and reversed in part, and this cause is remanded for further proceedings consistent with this opinion.

Affirmed in part and reversed in part; cause remanded.

GEIGER and BYRNE, JJ., concur.