Filed 10/25/10   NOS. 4-09-0702, 4-09-0718 cons.

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

PLIURA INTERVENORS,                              )     Direct
         Petitioner-Appellant,                   )     Administrative
         v.  (No. 4-09-0702)                     )     Review of the
THE ILLINOIS COMMERCE COMMISSION; and            )     Illinois Commerce
ENBRIDGE PIPELINES (ILLINOIS), L.L.C.,           )     Commission
         Respondents-Appellees.                  )     No. 07-0446
--------------------------------------           )
TURNER INTERVENORS,                              )
         Petitioner-Appellant,                   )
         v.  (No. 4-09-0718)                     )
THE ILLINOIS COMMERCE COMMISSION; and            )
ENBRIDGE PIPELINES (ILLINOIS), L.L.C.,           )
         Respondents-Appellees.                  )

_____

         JUSTICE STEIGMANN delivered the opinion of the court:

         In August 2007, respondent, Enbridge Pipelines (Illi-

nois), L.L.C. (Enbridge Pipelines), filed an application for a

certificate in good standing and other relief pursuant to section

15-401 of the Public Utilities Act (220 ILCS 5/15-401 (West

2008)).  In July 2009, corespondent, the Illinois Commerce

Commission, approved Enbridge Pipelines' application, which (1)

certified it as a "common carrier by pipeline" and (2) authorized

the construction, operation, and maintenance of an oil pipeline.

         Petitioners, Pliura Intervenors and Turner Intervenors

(collectively, Intervenors), appeal, both arguing that the

Commission erred by determining that (1) Enbridge Pipelines was

fit, willing, and able to construct, operate, and maintain an oil

pipeline and (2) a public need for the pipeline existed.  We
disagree and affirm.

I. BACKGROUND

A. The Corporate Structure of Enbridge and Its
Southern Access Expansion Project

Enbridge, Inc. (Enbridge), is an energy transportation
and distribution corporation headquartered in Alberta, Canada,
that, among other business interests, has a "liquids transporta-
tion unit."  That unit's purpose, in pertinent part, is to
transport oil from producers and shippers in western Canada to
markets and refineries in the United States and eastern Canada
through an integrated oil pipeline network that spans approxi-
mately 1,900 miles across North America.  Enbridge's oil pipeline
network includes its "Mainline System," which is composed of (1)
the "Lakehead System"--the United States portion of its network
that transports oil to seven Great Lakes states, including
Illinois--and (2) the oil pipeline system of its wholly owned
subsidiary, Enbridge Pipelines.

In December 2005, Enbridge began its "Southern Access
Expansion Project" (expansion project), which focused on "facil-
ity improvements, expansions, and enhancements designed to ensure
adequate, efficient, and economic transportation service[s] for
producers, and users of crude petroleum."  In April 2007, the
Commission certified two of Enbridge's affiliates as common
carriers by pipeline, which authorized them to construct, oper-

- 2 -

ate, and maintain the expansion project. The first phase of the expansion project concerned the construction of a new pipeline in Wisconsin that ran parallel to the Lakehead System. The second phase concerned, in pertinent part, a new pipeline from phase one's termination point to Enbridge's terminal near Pontiac, Illinois. Enbridge claimed that when completed, the expansion project would allow it to transport an additional 400,000 barrels per day (bpd) to its Pontiac terminal.

### B. Enbridge Pipeline's Application for Certificate in Good Standing

In August 2007, Enbridge Pipelines filed an application for certificate in good standing and other relief pursuant to section 15-401 of the Act (220 ILCS 5/15-401 (West 2008)). The application sought approval from the Commission to (1) construct an oil pipeline extension spanning 170 miles from its terminal near Pontiac to its 13-million-barrel oil storage facility in Patoka, Illinois, which it termed its "Southern Access Extension Project" (pipeline extension) and (2) acquire, when necessary, private property to construct the pipeline extension under eminent domain as authorized by section 8-509 of the Act (220 ILCS 5/8-509 (West 2008)).

In support of its application, Enbridge Pipelines noted that the United States Department of Energy projected a 30% increase in United States oil consumption from the 20.7 million bpd consumed in 2005 to 26.9 million bpd by 2030, based on

increases in population and economic activity.  Noting that Illinois (1) is a leading consumer of energy in the United States and (2) produced only 3% of the oil required to meet that demand, Enbridge Pipelines argued that the five refineries located in or near Illinois required a constant, adequate, and dependable supply of oil, which its pipeline extension could provide.

Enbridge Pipelines contended that its pipeline extension would, in pertinent part, benefit Illinois by increasing its ability to deliver Canadian oil to various Illinois markets and refineries.  In particular, Enbridge Pipelines asserted that the pipeline extension would afford United States refineries an additional initial capacity of 400,000 bpd for further movement from its Patoka storage facility to various markets and refineries in the southern, eastern, and western regions of the United States.  Enbridge Pipelines further noted that by obtaining and processing oil from Canada, refineries would enjoy lower supply costs, dependable sourcing, and expeditious delivery.  Enbridge Pipelines claimed that such advantages benefit Illinois consumers in the form of (1) lower prices for petroleum-based products, (2) increased and consistent oil availability, (3) refinery stability that results in consistent tax revenues for local economies, (4) decreased supply disruptions caused by natural phenomenon such as hurricanes or world insurrection, and (5) additional oil delivery options through increased competition.

Enbridge Pipeline's application noted that as a publicly traded company on both the Toronto and New York stock exchanges, Enbridge had a total capitalization of $14.2 billion and earnings to common shareholders of $616 million. Appended to its application, Enbridge Pipelines included Enbridge's 2006 annual report, which documented, in pertinent part, its financial strength. In this regard, Enbridge Pipelines (1) represented that Enbridge had committed the financial capital to construct the pipeline extension and (2) touted its "clear" commitment toward that goal.

C. The Testimony and Evidence Presented to the Commission

We first note that the initial "direct testimony" in this case was presented to the Commission in the form of (1) filed written statements that documented the questions posed by the respective parties' counsel and the corresponding witnesses' answers absent the opposing party and (2) direct oral testimony at a March 2009 hearing before the Commission, in which the opposing party was afforded the opportunity to cross-examine witnesses' on their respective written and oral statements.

1. The Pipeline Extension Director's Testimony

In October 2007, the director of the pipeline extension filed his testimony with the Commission, in which he confirmed that he had verified Enbridge Pipelines' August 2007 application for certificate in good standing and for other relief. In

- 5 -

adopting the application's content as part of his oral testimony, the director reiterated that Illinois plays a "major role in the international and interstate transportation network for crude petroleum." The director claimed that the pipeline extension would enhance Illinois' role by allowing southern Illinois refineries to satisfy increased demand, which would strengthen its economy and reduce the instability that volatile markets inflict on an ever-tightening world oil supply. With regard to its financial stability, the director noted Enbridge's (1) prior construction and current operation of two oil pipelines and one natural gas pipeline in Illinois and (2) $2 billion investment to enhance its integrated oil pipeline network.

The director (1) acknowledged that he could not quantify the specific monetary benefit that would accrue to Illinois citizens if the Commission approved the pipeline extension, but (2) characterized Patoka as an "important crude oil hub" that "will enhance Illinois' position as an important part of this vital transportation network," and (3) stated that the pipeline extension was designed to deliver a maximum of 800,000 bpd.

2. Enbridge Pipeline's Expert Testimony

In October 2007, Enbridge Pipeline's economics expert, who was retained to provide testimony regarding the benefits Illinois would experience if the Commission granted Enbridge Pipeline's application, filed his written testimony. The expert

- 6 -

explained that the pipeline extension was part of the expansion project that Enbridge had undertaken.  With regard to that project, the expert noted the following substantial benefits Illinois consumers would enjoy: (1) a present-value savings of $407 million based on the mitigating effect increased oil production would have on gasoline prices, distillate, and jet fuel; (2) improved regional security as dependency on uncertain oil supplies from South American and the Middle East are replaced by a stable flow of Canadian oil; (3) gains in "regional economies" based on planned refinery upgrades, oil storage expansion, and pipeline expansion as the anticipated secure supply of Canadian oil replaces the recent history of foreign oil disruptions; (4) a commitment from Illinois refineries to expand their respective facilities to accommodate the additional oil; (5) increased security and safety benefits through local and expanded oil storage facilities; and (6) additional employment opportunities.

In opining that the Commission should grant Enbridge Pipeline's application, the expert noted the following:

> "[T]he [pipeline e]xtension *** is extremely
> important to Illinois and its consumers.  In
> addition to providing access to a secure
> source of petroleum for many years to come,
> the [pipeline e]xtension *** will likely
> provide Illinois consumers with substantial

- 7 -

savings in the event of any crisis that oc-
curs in the future, especially if the tight
spare capacity that exists today continues,
as is likely, in the future."

The expert (1) explained that his $407 million present-value-savings estimate was based on the 400,000 bpd that would flow to Patoka--and eventually the "world supply"--if the Commission approved Enbridge Pipelines' application and (2) acknowledged that he had not confirmed information regarding proposed refinery upgrades but instead, relied on the representations made in Enbridge Pipeline's application.

### 3. The Commission's Evaluation of Enbridge Pipeline's Financial Stability

In January 2008, a senior financial analyst in the Commission's financial-analysis division filed her written testimony, concluding that "[t]hrough its relationship with Enbridge ***, Enbridge [Pipelines] is capable of financing the construction, operation[,] and maintenance of the proposed pipeline from near Pontiac to Patoka." In particular, the analyst noted that as of August 2007, the pipeline-extension cost was estimated at approximately $500 million. Enbridge Pipelines planned to finance these construction costs with short-term intercompany loans from Enbridge. After completing the pipeline extension, Enbridge Pipelines planned to refinance the debt with a combination of short- and long-term debt capitalization pro-

vided by Enbridge.

The analyst further noted that two investor services had rated Enbridge as financially stable with either a minimal or moderate credit risk, whose business risk profile was one of the lowest in the industry based on its long-term energy contracts. As of September 2007, Enbridge had $3.2 billion of unused credit facilities that it planned to use to support Enbridge Pipelines' short-term financing. The analyst also opined that based on its stable credit rating, Enbridge had sufficient access to capital from debt and equity markets to refinance Enbridge Pipelines' short-term construction loans.

### 4. The Intervenors' Expert Testimony

In January 2008, the Intervenors' economic expert, who was retained to evaluate the expert opinions of Enbridge Pipelines' economic expert, filed his written testimony. That expert concluded, in pertinent part, that a public need did not exist for the pipeline extension because Enbridge Pipelines' expert did not consider all the significant costs and benefits. Specifically, the Intervenors' expert noted the following deficiencies: (1) the analysis failed to consider the costs and benefits of transporting 400,000 bpd from Pontiac to Patoka, which in essence "double counts" benefits he had previously attributed to the expansion project; (2) the claimed benefits from increased oil production are independent of the location of the pipeline

extension because the analysis does not delineate the Illinois-specific price impact of the expansion project; (3) the claimed increased oil-production benefits ignore the negative impacts regarding the depletion of an exhaustible resource and the increased production of "greenhouse" gases; and (4) the analysis does not accurately measure economic benefits because it fails to "account for economic losses in other areas that result from the pipeline extension's expenditures."

D. The Commission's Determination

In July 2009, the Commission issued its order, meticulously documenting, in pertinent part, the parties' arguments regarding (1) Enbridge Pipelines' fitness, willingness, and ability to construct, operate, and maintain the proposed pipeline extension and (2) whether a public convenience and necessity required issuance of the certificate in good standing under section 15-401 of the Act (220 ILCS 5/15-401 (West 2008)).

1. The Commission's Determination That Enbridge
Pipelines Was Fit, Willing, and Able

In determining that Enbridge Pipelines was fit, willing, and able to construct and maintain the proposed pipeline extension, the Commission relied on its senior financial analyst's testimony, stating as follows:

"[The s]enior [f]inancial [a]nalyst[]

testified [that] '[t]hrough its relationship

with Enbridge, *** Enbridge [Pipelines] is

- 10 -

capable of financing the construction, opera-
tion[,] and maintenance of the proposed pipe-
line from near Pontiac to Patoka.'  ***   In
support of her opinion, [the analyst] de-
scribed in detail the analysis she performed,
and the bases for her conclusions.  She also
noted that Enbridge operates the world's
longest crude oil and liquids pipeline system
in Canada and the [United States].

The Commission observes that no similar
analyses were performed by parties who dis-
agree with [the analyst's] conclusions re-
garding [Enbridge's] fitness.

As a condition of this [o]rder, Enbridge
*** shall fulfill its commitments to provide
such financial support as is reasonably nec-
essary for the construction and operation of
the proposed pipeline *** and Enbridge [Pipe-
lines] shall fulfill its commitments to ob-
tain such financial support from Enbridge
***."

2. The Commission's Determination That
a Public Need Existed

In determining that Enbridge Pipelines had shown a
public convenience and necessity for the proposed pipeline

- 11 -

extension, the Commission quoted the following definition of "public need":

> "In the context of public need, it is appropriate to look at the larger group of the general public to see if it requires the service, not whether some components of the public are in fact using the service.  Only by looking to the public at large can one determine whether there is an actual existing or expected popular need for the proposed service[,] which should not be denied."
> Lakehead Pipeline Co. v. Illinois Commerce Comm'n, 296 Ill. App. 3d 942, 955, 696 N.E.2d 345, 354 (1998).

Relying on this definition, the Commission determined that the pipeline extension would provide (1) Illinois, as well as our nation, additional oil supplies from a friendly ally and (2) access to a secure and reliable energy supply that assists our nation in achieving our energy needs, which benefits Illinois citizens either directly or indirectly.  (The Commission also determined that the record did not support a finding authorizing Enbridge to acquire land under eminent domain, a determination that the parties do not raise in this appeal.)

This appeal followed.

## II. ANALYSIS

Before addressing the Intervenors' claims, we briefly discuss the statutory licensing procedure and our standard of review.

### A. The Statutory Licensing Procedure

Section 15-401 of the Act, which describes the requirements to operate as a common carrier by pipeline, provides, in pertinent part, the following:

"(a) No person shall operate as a common carrier by pipeline unless the person possesses a certificate in good standing authorizing it to operate as a common carrier by pipeline. No person shall begin or continue construction of a pipeline or other facility, other than the repair or replacement of an existing pipeline or facility, for use in operations as a common carrier by pipeline unless the person possesses a certificate in good standing.

(b) Requirements for issuance. The Commission, after a hearing, shall grant an application for a certificate authorizing operations as a common carrier by pipeline, in whole or in part, to the extent that it

finds that the application was properly filed; a public need for the service exists; the applicant is fit, willing, and able to provide the service in compliance with this Act, Commission regulations, and orders; and the public convenience and necessity requires issuance of the certificate."  220 ILCS 5/15-401(a), (b) (West 2008).

### B. The Standard of Review

"A reviewing court generally gives substantial deference to the decisions of an administrative agency because of its experience and expertise."  Alhambra-Grantfork Telephone Co. v. Illinois Commerce Comm'n, 358 Ill. App. 3d 818, 821, 832 N.E.2d 869, 872 (2005).  With regard to such decisions, a reviewing court's powers are limited because it exercises a statutory jurisdiction pursuant to the Act, rather than general appellate jurisdiction.  City of Chicago v. Illinois Commerce Comm'n, 264 Ill. App. 3d 403, 408, 636 N.E.2d 704, 707-08 (1993).  Under this strict statutory standard, a reviewing court's reversal, in whole or in part, of a Commission's rule, regulation, order, or decision is limited to the following circumstances:  (1) the Commission's findings were not supported by substantial evidence, (2) the Commission lacked jurisdiction, (3) the Commission's determination violated the state or federal constitution or laws, or (4)

- 14 -

the proceedings or manner in which the Commission arrived at its determination infringed on the appellant's state or federal constitutional rights.  220 ILCS 5/10-201(e)(iv) (West 2008); Commonwealth Edison Co. v. Illinois Commerce Comm'n, 398 Ill. App. 3d 510, 514, 924 N.E.2d 1065, 1074 (2009).  "'Substantial evidence' means more than a mere scintilla" but "does not have to rise to the level of a preponderance of the evidence."  Commonwealth Edison Co., 398 Ill. App. 3d at 514, 924 N.E.2d at 1074.

"[O]n appeal from an order of the Commission, its findings of fact are to be considered prima facie true; its orders are considered prima facie reasonable; and the burden of proof on all issues raised in an appeal is on the appellant." Commonwealth Edison Co., 398 Ill. App. 3d at 514, 924 N.E.2d at 1074.  Thus, the Commission's findings and conclusions on questions of fact will not be disturbed unless they are against the manifest weight of the evidence.  Illinois-American Water Co. v. Illinois Commerce Comm'n, 331 Ill. App. 3d 1030, 1036-37, 772 N.E.2d 390, 395 (2002).  "To warrant reversal, the appellant must show that the opposite conclusion is clearly evident."  Illinois-American Water Co., 331 Ill. App. 3d at 1037, 772 N.E.2d at 395.

### C. The Intervenors' Claims That the Commission Erred by Approving Enbridge Pipelines' Application

#### 1. The Commission's Determination Regarding Enbridge Pipelines' Fitness

The Intervenors argue that the Commission erred by

- 15 -

determining that Enbridge Pipelines was fit, willing, and able to construct, operate, and maintain an oil pipeline.  Specifically, they contend that "[i]t was insufficient for the Commission to accept [Enbridge Pipeline's] representation without separate verification that *** Enbridge *** had both the ability and the obligation to fully fund [the pipeline extension]."  (Emphasis in original.)  We disagree.

In this case, the Intervenors essentially urge this court--without citation to any competent authority--to create a new statutory requirement within section 15-401(b) of the Act (220 ILCS 5/15-401(b) (West 2008)) where none presently exists.  Specifically, that as a matter of law, evidence of adequate funding provided by an applicant's parent organization--which the Intervenors concede Enbridge can provide--can only be demonstrated when the parent has indemnified its subsidiary.  We decline the Intervenors' invitation to do so.

Here, the Commission's determination that Enbridge Pipelines was fit, willing, and able to construct, operate, and maintain the pipeline extension was based, in pertinent part, on the following evidence: (1) that Enbridge Pipelines is a subsidiary of the world's longest crude oil and liquids pipeline system in Canada and the United States; (2) the business rationale for the integration of Enbridge's expansion project with Enbridge Pipelines' extension pipeline; (3) the Commission's financial

analysis that Enbridge Pipelines was capable of financing the pipeline extension through Enbridge; (4) two independent investor services rated Enbridge's financial stability and credit risk favorably; and (5) the reasonable and achievable manner in which Enbridge Pipelines would finance its short- and long-term debt associated with the construction of the pipeline extension.

Moreover, realizing the general corporate relationship and specific financial relationship between Enbridge and Enbridge Pipelines, the Commission conditioned its approval of Enbridge Pipelines' application to operate as a common carrier by pipeline on (1) Enbridge's fulfillment of its commitment to provide such financial support as is reasonably necessary for the construction and operation of the pipeline extension and (2) Enbridge Pipelines' acquisition of such financial support from Enbridge.

Given our standard of review, we conclude that the Commission's determination that Enbridge Pipelines was fit, willing, and able to construct, operate, and maintain the pipeline extension was not against the manifest weight of the evidence. See Commonwealth Edison Co., 398 Ill. App. 3d at 514, 924 N.E.2d at 1075 (a reviewing court can neither reevaluate the credibility or weight of the evidence nor substitute its judgment for that of the Commission).

2. The Commission's Determination That a Public Need Existed

The Intervenors also argue that the Commission erred by

determining that a public need for the pipeline existed. Specifically, they contend that the Commission did not have authority to consider evidence of regional, national, or global benefits when determining whether the public convenience and necessity required issuance of the certificate authorizing the pipeline extension. We disagree.

Though we are not bound by the Commission on questions of law, we give substantial deference to an interpretation of an ambiguous statute by the agency charged with the administration and enforcement of the statute. Commonwealth Edison Co., 398 Ill. App. 3d at 514, 924 N.E.2d at 1074. A reviewing court will not substitute its interpretation of a statutory provision for a reasonable one adopted by the agency charged with the statute's administration. Davis Bancorp, Inc. v. Board of Review of the Department of Employment Security, 393 Ill. App. 3d 135, 141-42, 911 N.E.2d 1125, 1132 (2009).

In this case, the Intervenors essentially challenge the Commission's interpretation of the undefined statutory terms "public need" and "public convenience and necessity." In particular, they argue for a narrow interpretation of those terms by asserting that the "Commission must consider the public need of Illinois citizens, not Midwesterners, [United States c]itizens, or citizens of the world." However, given the Commission's (1) broad authority to interpret statutes that it is charged with

- 18 -

administering (<u>Commonwealth Edison Co. v. Illinois Commerce</u> <u>Comm'n</u>, 322 Ill. App. 3d 846, 854, 751 N.E.2d 196, 203 (2001)) and (2) broad interpretation of those terms has been consistently affirmed by the appellate and supreme court of this state (see <u>Lakehead Pipeline Co.</u>, 296 Ill. App. 3d at 955, 696 N.E.2d at 354 (listing cases that stand for this proposition)), we reject the Intervenors' claim that the Commission's interpretation was unreasonable or erroneous.

Moreover, we similarly reject any notion that because the Commission's focus regarding public convenience and necessity was broad, the citizens of Illinois would not experience a discrete benefit once the pipeline extension was operational. Here, the evidence presented regarding public convenience and necessity concerned (1) the location of the pipeline extension, (2) the additional oil capacity that pipeline extension would transport, (3) the destination of the oil to a major hub within Illinois for further travel throughout the United States, (4) current market factors affecting the stability of alternate sources of oil, (5) projections of increased oil demands, (6) increased revenues for local economies, and (7) increased market competition resulting in lower prices for petroleum-based products.

Accordingly, we conclude that the Commission's determination that the pipeline extension would benefit Illinois citi-

zens either directly or indirectly was supported by more than a mere scintilla of evidence.

### III. CONCLUSION

For the reasons stated, we affirm the Commission's judgment.

Affirmed.

McCULLOUGH, J., concurs.

TURNER, J., dissents.

JUSTICE TURNER, dissenting:

For the following reasons, I respectfully dissent.

The Commission determined Enbridge was fit, willing, and able to construct, operate, and maintain an oil pipeline. The record fully supports that finding. However, it is undisputed the record contains no evidence of Enbridge Pipelines' independent financial ability. Instead, the record indicates Enbridge Pipelines depends solely upon Enbridge for its finances and obligations. While the record shows Enbridge's commitment to finance Enbridge Pipelines for the pipeline's construction and maintenance, the record does not demonstrate Enbridge's oral commitment legally requires it to support, maintain, and finance Enbridge Pipelines. Moreover, Enbridge did not join Enbridge Pipelines in the application for the certificate in good standing, nor did the Commission require Enbridge to become a party as a condition for approval of the application. Thus, in my view, the record fails to support the Commission's finding Enbridge Pipelines is fit and able to construct, operate, and maintain the proposed pipeline. Accordingly, I would reverse the Commission's order.