# Illinois Official Reports

## Appellate Court

*Enbridge Pipeline (Illinois), LLC v. Hoke*, 2017 IL App (4th) 150544

| | |
|---|---|
| Appellate Court Caption | ENBRIDGE PIPELINE (ILLINOIS), LLC, n/k/a Illinois Extension Pipeline Company, LLC, Plaintiff-Appellee, v. EDWARD HOKE, SONNA H. HOKE, NON-RECORD CLAIMANTS, and UNKNOWN OWNERS, Defendants-Appellants.—ENBRIDGE PIPELINE (ILLINOIS), LLC, n/k/a Illinois Extension Pipeline Company, LLC, Plaintiff-Appellee, v. PMC FARMS, LLC; CHARLES MURPHY, Tenant; NON-RECORD CLAIMANTS; and UNKNOWN OWNERS, Defendants-Appellants. |
| District & No. | Fourth District<br>Docket Nos. 4-15-0544, 4-15-0545 cons. |
| Filed | July 6, 2017 |
| Decision Under Review | Appeal from the Circuit Court of De Witt County, Nos. 14-ED-3, 14-ED-4; the Hon. William Hugh Finson, Judge, presiding. |
| Judgment | Vacated; cause remanded with directions. |
| Counsel on Appeal | Thomas J. Pliura, of LeRoy, for appellants.<br><br>Gerald A. Ambrose, Steven J. Horowitz, Dale E. Thomas, and Brian A. McAleenan, of Sidley Austin LLP, of Chicago, and Jacob E. Gancarczyk and John M. Spesia, of Spesia & Ayers, of Joliet, for appellee. |

| Panel | JUSTICE STEIGMANN delivered the judgment of the court, with opinion.<br>Justices Holder White and Pope concurred in the judgment and opinion. |

**OPINION**

¶ 1    In April 2014, the Illinois Commerce Commission (Commission) granted plaintiff, Enbridge Pipeline (Illinois), LLC, now known as the Illinois Extension Pipeline Company (IEPC), eminent-domain authority to acquire easements over certain real estate for the planned construction of an approximately 170-mile liquid petroleum (oil) pipeline known as the Southern Access Extension (SAX project).

¶ 2    In July and August 2014, IEPC filed separate complaints for "condemnation of permanent and temporary easements for common-carrier pipeline" against defendants (1) Edward Hoke and Sonna H. Hoke (Hokes) (DeWitt County case No. 14-ED-3; this court's case No. 4-15-0544) and (2) PMC Farms, LLC, and its tenant, Charles Murphy, (PMC) (DeWitt County case No. 14-ED-4 and this court's case No. 4-15-0545) (collectively, landowners). Through its condemnation filing, IEPC sought to obtain right-of-way and easement interests in landowners' respective properties and determine just compensation for both interests. Thereafter, landowners each filed a "traverse and motion to dismiss" (traverse motions), requesting dismissal of IEPC's condemnation complaints. In December 2014, the trial court denied both traverse motions.

¶ 3    At a jury trial that began in May 2015, IEPC presented its case-in-chief. Thereafter, the trial court permitted IEPC to conduct a *voir dire* inquiry of Edward and Charles out of the jury's presence. Immediately following IEPC's inquiry, the court granted IEPC's motion to bar the testimony of Edward and Charles regarding the (1) fair-market value of their properties before and after installation of the SAX project and (2) damages incurred to the value of their remaining property after completion of the SAX project. The court also granted IEPC's oral motion to exclude landowners' expert's valuation testimony pursuant to Illinois Supreme Court Rule 213(g) (eff. Jan. 1, 2007) because the expert failed to disclose the basis for his valuation opinions as required by Illinois Supreme Court Rule 213(f)(3) (eff. Jan. 1, 2007). IEPC then moved for directed verdicts on its condemnation suits. Following argument, the court (1) granted directed verdicts in IEPC's favor and (2) awarded landowners compensation of $8500 in case No. 14-ED-3 and $2000 in case No. 14-ED-4.

¶ 4    Landowners appeal, raising numerous claims that challenge the trial court's rulings. For the reasons that follow, we vacate the trial court's denial of landowners' traverse motions and remand with directions for further proceedings.

¶ 5                                    I. BACKGROUND
¶ 6                                  A. Procedural History
¶ 7    We provide the following synopsis of the pertinent litigation involving the SAX project to place landowners' appeal in context.

¶ 8      1. *IEPC's Application for a Certificate in Good Standing*
                                *and Eminent-Domain Authority*

¶ 9      In August 2007, IEPC applied for a certificate in good standing and other relief pursuant to section 15-401 of the Common Carrier by Pipeline Law (Pipeline Law) (220 ILCS 5/15-401 (West 2006)). (The Pipeline Law appears under article XV of the Public Utilities Act (220 ILCS 5/1-101 to 20-120 (West 2006)).) IEPC sought the Commission's authorization to (1) construct, operate, and maintain the SAX project and (2) acquire, when necessary, private property under eminent-domain authority to install and maintain the SAX project as permitted by section 8-509 of the Public Utilities Act (220 ILCS 5/8-509 (West 2006)). IEPC described the proposed SAX project as a 36-inch diameter underground oil pipeline, originating from IEPC's Flanagan terminal located near Pontiac, Illinois, and terminating approximately 170 miles south, at IEPC's Patoka terminal located near Patoka, Illinois. The planned SAX project traversed 679 tracts of land located in the counties of Livingston, McLean, DeWitt, Macon, Shelby, Christian, Fayette, and Marion. Specifically, IEPC sought (1) a 60-foot wide permanent easement right-of-way for the pipeline and (2) an additional 60-foot temporary easement to facilitate construction.

¶ 10     In July 2009, the Commission issued an order in docket No. 07-0446, granting IEPC a certificate in good standing but denying IEPC's request for eminent-domain authority. As to eminent domain, the Commission instead urged that IEPC continue negotiations with landowners who had declined the compensation IEPC had offered in exchange for the aforementioned easements on the landowners' respective properties. The Commission's order provided, however, that IEPC could renew its request for eminent-domain authority by "demonstrating that it has made reasonable attempts to obtain easements, through good-faith negotiations."

¶ 11     Some affected landowners (intervenors) appealed the Commission's grant of the certificate in good standing, and this court affirmed. *Pliura Intervenors v. Illinois Commerce Comm'n*, 405 Ill. App. 3d 199, 200, 942 N.E.2d 576, 578 (2010) (*Intervenors I*). Specifically, we rejected intervenors' argument that the Commission erred by determining that (1) IEPC was fit, willing, and able to construct, operate, and maintain an oil pipeline and (2) a public need existed for the pipeline. *Id.* at 208-09, 942 N.E.2d at 584-85. The Supreme Court of Illinois later denied intervenors' petition for leave to appeal. *Pliura Intervenors v. Illinois Commerce Comm'n*, 239 Ill. 2d 589, 943 N.E.2d 1108 (2011) (table).

¶ 12     2. *IEPC's Renewed Petition for Eminent-Domain Authority*

¶ 13     In July 2013, IEPC renewed its request for eminent-domain authority, seeking to condemn 148 of the 679 tracts of land traversed by the planned SAX project route because the owners of those respective properties had either (1) refused to negotiate with IEPC or (2) declined IEPC's compensation offers despite extensive negotiations. (IEPC's continued negotiations reduced the number of "holdout" landowners from 148 to 127, meaning approximately 81% of landowners had reached an agreement with IEPC.)

¶ 14     In December 2013, an administrative law judge (ALJ) conducted a hearing on IEPC's request for eminent-domain authority. A senior engineer employed by the Commission testified, in pertinent part, that approval to exercise eminent-domain authority required IEPC to show that (1) reasonable attempts were made to acquire the outstanding land rights through good-faith negotiations and (2) additional attempts to acquire the land rights at issue would

have been unsuccessful. In evaluating those two metrics, the engineer stated that the Commission considers numerous factors, which include—but are not limited to—the following: (1) the number and extent of the petitioner's contacts with the landowner, (2) whether the petitioner explained its compensation offer to the landowner, (3) whether the compensation the petitioner offered was comparable to offers made to similarly situated landowners, (4) petitioner's efforts to address landowner concerns, and (5) the likelihood that further negotiations would be successful. After testifying about IEPC's efforts as to each of these five factors, the engineer recommended that the Commission approve IEPC's petition for eminent-domain authority. In April 2014, the ALJ recommended that the Commission grant IEPC eminent-domain authority.

¶ 15 Later that month, the Commission issued its written order, in which it accepted the ALJ's recommendation and granted IEPC eminent-domain authority. In so doing, the Commission explained that the grant of a request for eminent-domain authority under section 8-509 of the Public Utilities Act requires "a utility [to] show that it made a reasonable attempt to acquire the property at issue." The Commission then recognized that as to the aforementioned five factors, sufficient evidence was presented to show that (1) the number, nature, and extent of [IEPC's] contacts with the landowners had been adequate; (2) IEPC adequately explained its offer of compensation to landowners; (3) IEPC's offers were comparable to offers made to similarly situated landowners, noting that IEPC's offers for the easements were 125% of fee value; (4) IEPC made an effort to address landowner concerns by making adjustments to the SAX project route to avoid certain structures, land features, or wooded areas; and (5) "given the large numbers of holdouts and the length of time that has elapsed during the negotiation phase, the situation is unlikely to change on a large scale absent the Commission granting [IEPC] the right to exercise eminent domain."

¶ 16 Intervenors affected by the Commission's grant of eminent-domain authority appealed, and this court affirmed. *Pliura Intervenors v. Illinois Commerce Comm'n*, 2015 IL App (4th) 140592-U (*Intervenors II*). Pertinent to this appeal, we rejected intervenors' argument that the Commission's grant of eminent-domain authority was not supported by substantial evidence that IEPC had engaged in good-faith negotiations. *Id.*

¶ 17                                                   3. *IEPC's Motion To Reopen*

¶ 18 In May 2014, IEPC filed a "Motion to Reopen and Amend Order Concerning Diameter of the [SAX]," requesting an amendment to the July 2009 certificate in good standing that the Commission issued in docket No. 07-0446. Specifically, IEPC's amendment sought only to reduce the pipeline's diameter from 36 to 24 inches.

¶ 19 In support of its motion, IEPC alleged that uncertain economic conditions and market demand for a different grade of crude oil caused IEPC to reevaluate the original parameters of the SAX project. Based on these changed factors, IEPC calculated that the capacity requirements of the SAX project would be approximately 300,000 barrels per day (bpd) of oil, which "can be readily accommodated by a 24-inch outside diameter pipeline." (In its August 2007 application for a certificate in good standing, IEPC determined that the capacity of the 36-inch pipeline was approximately 400,000 bpd.) With regard to its 300,000 bpd approximation, IEPC had received long-term contractual commitments from Marathon Petroleum Company (Marathon) and another undisclosed oil shipper for a total volume of

approximately 210,000 bpd. IEPC stated that the remaining 90,000 bpd capacity would be available to other shippers of light and heavy crude.

¶ 20    In June 2014, the Commission reopened docket No. 07-0446, and at a later evidentiary hearing, an ALJ considered (1) written and oral direct testimony and (2) oral cross-examination testimony on IEPC's May 2014 motion to amend. Thereafter, the parties to that litigation filed, in pertinent part, additional posthearing briefs. In its November 2014 posthearing reply brief, IEPC acknowledged that in July 2014, Enbridge Energy Company, Inc. (IEPC's parent company) agreed to sell a 35% equity interest in the SAX project to Marathon.

¶ 21    In December 2014, the ALJ recommended that the Commission grant IEPC's motion to amend, subject to certain conditions. Later that month, the Commission determined that public convenience and necessity required issuance of an amended certificate to authorize a 24-inch pipeline. In particular, the Commission found that (1) a public need for the 24-inch pipeline existed; (2) no other substantial changes specified in the original certificate, such as pipeline route and easement width, were proposed or granted; and (3) the 24-inch pipeline would not impose additional burdens on landowners than the originally proposed 36-inch pipeline.

¶ 22    Intervenors appealed, arguing that the Commission erred by amending the July 2009 certification because (1) the Commission's findings were not supported by substantial evidence, (2) IEPC's certificate in good standing had expired, and (3) IEPC was no longer a common carrier by pipeline because of self-imposed limits that excluded the public. As to the last argument, intervenors contended that (1) IEPC lost its certification by selling a 35% interest in the SAX project to Marathon, (2) Marathon's 35% interest converted the SAX project into a private pipeline, and (3) the 24-inch amendment to the SAX project discriminated against the general public by not making the SAX project capacity available on an equal basis.

¶ 23    In March 2016, this court affirmed the Commission's order, rejecting intervenors' (1) sufficiency-of-the-evidence, (2) expiration, and (3) private-pipeline claims. *Pliura Intervenors v. Illinois Commerce Comm'n*, 2016 IL App (4th) 150084-U (*Intervenors III*). The Supreme Court of Illinois later denied intervenors' petition for leave to appeal. *Pliura Intervenors v. Illinois Commerce Comm'n*, No. 120757 (Ill. Sept. 28, 2016).

¶ 24                              B. The Issues on Appeal

¶ 25    The issues presented in this appeal concern primarily the trial court's rulings on the following two issues: (1) landowners' traverse motions, including landowners' requests for discovery prior to the traverse hearing, and (2) IEPC's condemnation suit, which includes landowners' challenges to the trial court's underlying evidentiary rulings. The following chronological discussion is confined to those two issues.

¶ 26                    1. *IEPC's Final Offers and Condemnation Filings*

¶ 27    In separate letters, both dated May 19, 2014, IEPC proffered a final offer of $23,354 to the Hokes and $4573 to PMC for a 60-foot permanent right-of-way and a 60-foot temporary work-space area to be used during construction of the SAX project. IEPC informed landowners that (1) the final offer would expire in 10 days and (2) if landowners rejected the final offer, IEPC would file suit against landowners to enforce its interests.

¶ 28    In July and August 2014—after landowners failed to respond to its offers—IEPC filed separate "complaints for condemnation of permanent and temporary easements for common carrier pipeline," seeking to determine the just compensation for its right-of-way and easement interests in landowners' respective properties. Appended to IEPC's motion was the Commission's April 2014 order in docket No. 13-0446, which granted IEPC eminent-domain authority.

¶ 29                    2. *Landowners' Traverse Motions and Requests for Discovery*

¶ 30    In August and September 2014, the Hokes and PMC, respectively, filed a traverse motions, alleging that the following circumstances required dismissal of IEPC's condemnation suit:

"1. [IEPC] is not properly vested with authority to acquire the property of [landowners] by proceeding in eminent domain.

2. *** [T]he property sought to be acquired *** is not necessary or convenient for the purpose for which it is sought to be taken.

3. *** [T]he amount of property sought to be taken *** is in excess of [IEPC's] needs.

4. [IEPC] does not seek to use the property sought *** for a public use.

5. *** [T]here has been no bona fide attempt to agree with [landowners] as to the just compensation and damages to be paid for the property sought to be taken.

6. *** [T]he project for which [IEPC] seeks to acquire [landowners' property] does not constitute a public convenience or necessity.

7. *** [T]he project does not constitute a common carrier because of restrictions on access to the proposed pipeline.

8. [IEPC's] authority to acquire the property by eminent domain is limited to a project that [IEPC] is no longer pursuing and is not transferrable to a new and different project.

9. [IEPC] does not possess the legal authority to construct the pipeline *** because it has no certificate in good standing *** for the project it is pursuing and the certificate it previously obtained is expired and is not transferable to a different project."

¶ 31    In October 2014, landowners filed memoranda in support of their traverse motions, asserting, in part, that because a traverse motion concerns the protection of a property owner's land rights, such a filing is not—as IEPC claims—the equivalent of a motion to dismiss under section 2-619(a)(9) of the Code of Civil Procedure (Civil Code) (735 ILCS 5/2-619(a)(9) (West 2014) (a court can involuntarily dismiss a cause of action on the grounds "[t]hat the claim asserted against defendant is barred by other affirmative matter avoiding the legal effect of or defeating the claim")). Specifically, landowners alleged that a traverse motion hearing involves an evidentiary proceeding, which necessitates discovery and "resembles a trial more than it does a conventional motion hearing." Landowners asserted further that the "points initially raised by [their] traverse [motions], will require additional discovery not available to [landowners] prior to filing."

¶ 32                    3. *The Hearing on Landowners' Discovery Requests*
                          *and Traverse Motions*

¶ 33        We note that at the time of the November 2014 hearing on landowners' discovery requests and traverse motion filings, (1) this court had published *Intervenors I*, which affirmed the Commission's July 2009 grant of a certificate in good standing issued to IEPC in docket No. 07-0446; (2) *Intervenors II*—which challenged the Commission's grant of eminent-domain authority to IEPC in docket No. 13-0446—was pending before this court; and (3) the parties were aware that pending before the Commission was IEPC's motion to amend the certificate in good standing in docket No. 07-0466 to reflect the installation of a 24-inch diameter pipeline instead of a 36-inch diameter pipeline, which this court had yet to consider in *Intervenors III*.

¶ 34        To facilitate the reader's understanding of a traverse motion, we provide the following brief synopsis of the motion's purpose:

> " 'A traverse and motion to dismiss challenge plaintiff's right to condemn defendants' property. [Citations.] It is settled law in Illinois that when a traverse is filed, the burden is on the plaintiff to make a *prima facie* case of the disputed allegations. [Citations.] A *prima facie* case for the necessity of a condemnation is made by introducing a resolution or ordinance of the governing body which makes a finding that the condemnation is necessary. [Citations.] The agency that has been granted the power of eminent domain, rather than the court, has the authority to decide whether the exercise of the power is necessary to achieve an authorized purpose. Absent a clear abuse of this authority, the court will not inquire into the need or propriety of its exercise. [Citations.] Accordingly, where plaintiff establishes a *prima facie* case, it becomes the burden of defendant to show that there was an abuse of discretion by the governing board. [Citations.]' " *Enbridge Energy (Illinois), L.L.C. v. Kuerth*, 2016 IL App (4th) 150519, ¶ 51, 69 N.E.3d 287 (quoting *Lake County Forest Preserve District v. First National Bank of Waukegan*, 154 Ill. App. 3d 45, 51, 506 N.E.2d 424, 428 (1987)).

¶ 35        At the November 2014 hearing, the trial court first considered landowners' requests for discovery. Landowners acknowledged that trial courts in Kankakee, Livingston, McLean, and Will Counties had considered and rejected such requests made by similarly situated landowners. Landowners then argued that the reason discovery was necessary prior to the court's consideration of their traverse motions was to facilitate landowners' further inquiry into whether IEPC (1) was constructing a different pipeline than the SAX project the Commission approved in July 2009 in docket No. 07-0446, (2) provided a genuine good-faith offer and conveyed the bases for its offers, and (3) was constructing a private pipeline by virtue of Marathon's ownership interest in the SAX project. Landowners also requested to depose "individuals who have *** submitted *** affidavits" regarding their land-valuation methodology.

¶ 36        In response, IEPC argued that landowners were essentially attempting to re-litigate issues that had been considered and adjudicated by the Commission. In support of its argument, IEPC noted the Commission's orders in docket Nos. 07-0446 (granting IEPC certification to build the SAX project) and 13-0446 (granting IEPC eminent-domain authority). IEPC claimed that docket No. 07-0446 was a final order by virtue of this court's conclusion that the Commission correctly determined (1) IEPC "was fit, willing, and able to construct, operate, and maintain" the SAX project and (2) the SAX project satisfied a public need. *Intervenors I*, 405 Ill. App. 3d

at 207-09, 942 N.E.2d at 583-85. As to docket No. 13-0446, IEPC noted that the Commission's grant of eminent-domain authority remained a valid, enforceable order despite intervenors' then-pending appeal to this court in *Intervenors II*. IEPC argued further that because landowners' discovery requests were "improper collateral attacks" on the Commission's determinations, no discovery was warranted.

¶ 37 After considering further argument by the parties, the trial court denied landowners' request for discovery prior to the traverse hearing. In so ruling, the court stated that after considering the parties' filings in support of and in opposition to landowners' discovery requests and traverse motions, which included IEPC's July and August 2014 condemnation complaints, the court did not view landowners' discovery requests "appropriate."

¶ 38 Prior to conducting a hearing on landowners' traverse motions, the trial court recessed briefly to consider *City of Springfield v. West Koke Mill Development Corp.*, 312 Ill. App. 3d 900, 728 N.E.2d 781 (2000). The court did so because IEPC had argued during the court's consideration of landowners' request for discovery that this court's decision in *Koke Mill* stood for the proposition that a traverse motion is essentially a motion to dismiss under section 2-619(a)(9) of the Civil Code.

¶ 39 Upon resuming the hearing, IEPC again noted the Commission's orders granting (1) a certificate in good standing to IEPC in docket No. 07-0446 and (2) eminent-domain authority to IEPC in docket No. 13-0446. IEPC acknowledged that section 5-5-5(c) of the Eminent Domain Act (735 ILCS 30/5-5-5(c) (West 2014)) provided landowners the ability to rebut the statutory presumptions established by the aforementioned orders—specifically, that IEPC's interests in landowners' respective properties were (1) "primarily for the benefit, use, or enjoyment of the public" and (2) "necessary for a public purpose." IEPC argued that landowners had not presented the requisite clear and convincing evidence to rebut those presumptions.

¶ 40 IEPC then attempted to explain that the offers made to landowners for IEPC's interests were based on 125% of the fee value of the landowners' respective properties. Landowners' objected, arguing that IEPC's explanation was improper because they were entitled to an evidentiary hearing where they could cross-examine IEPC's appraiser. The trial court overruled landowners' objections, stating as follows:

"As [the court] read from [*Koke Mill*], this [traverse proceeding] is akin to a 2[-]619 motion [to dismiss.] [L]ogically, that makes sense because *** the traverse and motion to dismiss is attempting to do the same thing a 2[-]619 motion would do. To rule on a 2[-] 619 motion, the court certainly doesn't need live body testimony. Affidavits, exhibits, [and] things like that suffice. [Landowners'] objection is overruled."

¶ 41 After IEPC concluded its argument, landowners attempted to call their first witness. The trial court interrupted, stating that "[the court has] already said [the traverse hearing is] a 2[-] 619 type hearing." When landowners requested to make an offer of proof regarding the content of the expected testimony, the court responded, as follows:

"As [the court] said, this is in the nature of a hearing in a motion under 2[-]619 [of the Civil Code. The court is] not aware of any authority for any testimony on that kind of a motion, or even for an offer of proof. So, the request to present an offer of proof is denied."

After further argument, the court denied landowners' traverse motions.

¶ 42                                    4. *Landowners' Counterclaim*

¶ 43         In December 2014, landowners filed a "counterclaim for damages to the remainder," in which they sought compensation from IEPC for the "substantial, irreparable, and unavoidable" damages to the remainder of their respective properties caused by the impending installation of the SAX project. Landowners claimed that such damage included (1) "the inherent danger of environmental damage, including the possibility of catastrophic environmental damage consequent to a breach, leak, or other failure of the pipeline"; (2) "the inherent danger to life, limb, and property resultant from a fire and/or explosion consequent to a breach, leak, or other failure of the pipeline"; (3) "diminished resale value"; (4) "necessary restrictions on current and future use of the property"; (5) "diminished crop yields"; (6) "diminished ground stability"; (7) "water drainage disruption and displacement"; and (8) "future costs associated with the removal of the abandoned pipeline."

¶ 44                          5. *IEPC's Motions* In Limine *and the Trial Court's Judgment*

¶ 45         Thereafter, IEPC filed a series of motions *in limine*, seeking to bar testimony from witnesses landowners disclosed as "controlled expert witnesses" pursuant to Illinois Supreme Court Rule 213(f)(3) (eff. Jan. 1, 2007). We confine our factual discussion, however, to IEPC's motion *in limine* as to landowners' expected valuation testimony.

¶ 46         On December 11, 2014, IEPC deposed landowners separately. During Edward's testimony, he opined that the Hokes' 80-acre parcel of farmland was worth $15,000 per acre for an overall valuation of $1.2 million. Edward estimated that the value of the Hoke farmland would be reduced by 30% following installation of the SAX project (from $15,000 per acre to $10,500 per acre for a reduced valuation of $840,000). Edward acknowledged that the easement IEPC was requesting for the SAX project represented 0.578 acres of the Hokes' 80-acre parcel.

¶ 47         Charles opined that PMC's approximately 66-acre parcel was worth $15,000 per acre for an overall valuation of $990,000. Charles estimated that the value of the property would be reduced by 30% following installation of the SAX project (from $15,000 per acre to $10,500 per acre for a reduced valuation of $693,000).

¶ 48         On December 18, 2014, landowners filed a document titled "Consolidated *** Rule 213(f)(3) Disclosures," in which Edward and Charles stated their intent to provide expert opinions as to (1) the fair-market value of their respective properties before and after installation of the SAX project and (2) the damages incurred to the value of their remaining property after installation of the SAX project. Landowners' disclosure filing continued, as follows:

        "The bases of [landowners] opinions are *** personal knowledge of the property values, knowledge of the property[,] and the unique aspects of the geography. [Landowners are] qualified to speak to these issues based upon [their] personal knowledge and observation and extensive experience as an owner, manager[,] and farmer of the land. [Landowners] may additionally testify as to any opinions expressed in [their respective] discovery depositions."

¶ 49         In January 2015, IEPC filed a motion *in limine*, seeking to bar the testimony of Edward and Charles as controlled expert witnesses, arguing that neither landowner was qualified to testify as a land-valuation expert under Rule 213(f)(3). IEPC also argued that although landowners

were permitted to provide lay witness opinion testimony regarding the market value of their land, such testimony could be deemed inadmissible if landowners (1) were unfamiliar with the land or (2) had no reliable basis for their valuation estimate.

¶ 50    In March 2015, landowners filed a document titled "Additional Supplemental Rule 213(f) Disclosure," in which Edward and Charles reconfirmed their intent to provide controlled expert opinion testimony as to the fair-market value of their properties. Edward and Charles revised the basis for their respective opinions, as follows:

> "[The] basis for these opinions is *** knowledge of the real estate market for farmland in DeWitt County, further research into farm sales, conversations with farm real estate brokers, conversations with farm managers, *** experience as a farmer *** prior experience with easements on [the] property, *** understanding of the risks associated with the construction of the pipeline through the use of the temporary and permanent easements, including: interference with the rest of the property's farming operations during the construction period and the damages that will occur to the land as a result of the construction process."

Edward and Charles also noted that based on their review of the Enbridge Contractor Safety Program Manual, 2013 edition, mandatory hydrostatic testing would create an unsafe zone for 100 feet on either side of the proposed pipeline, which they opined would "likely create fear and stigma associated with the pipeline" and negatively impact the remainder value of their land.

¶ 51    Following an April 2015 hearing, the trial court barred Edward and Charles from testifying about the value of their respective properties as controlled expert witnesses. The court, however, granted Edward and Charles the opportunity to provide lay witness opinion testimony as to the overall market value of their land, provided their testimony was "competent and otherwise admissible." The court then agreed with IEPC that if landowners intended to present lay witness opinion testimony, IEPC could *voir dire* Edward and Charles outside of the jury's presence to challenge the admissibility of their valuations.

¶ 52                C. The Hearing on IEPC's Condemnation Suit and Landowners'
                         Counterclaim for Damages to the Remainder

¶ 53    We note that the jury trial on IEPC's condemnation suit and landowners' counterclaim occurred over a four-day period (May 27 to 29, 2015, and June 1, 2015). We provide only a brief summary of the evidence we deem appropriate to resolve the parties' dispute.

¶ 54                              1. *IEPC's Evidence*

¶ 55    Robert Cox, a licensed professional land surveyor, testified about certified plats he created, depicting the permanent and temporary easements IEPC sought on the properties owned by the Hokes and PMC. As to the Hokes' 80-acre parcel, Cox opined that (1) the permanent easement was 0.5785 acres and (2) the temporary easement, which included a second temporary work-space easement, was 2.5797 acres. As to PMC's 66½-acre parcel, Cox opined that (1) the permanent easement was 0.3073 acres and (2) the temporary easement was 0.1171 acres.

¶ 56    Lance Lunte, an Illinois licensed real estate appraiser since 1991, testified that his goal in this case was to calculate the fair-market value of IEPC's interest in landowners' properties. Lunte defined market value as "what a willing buyer would pay and a willing seller would

accept in cash when the buyer is not forced or compelled to buy and the seller is not compelled to sell." In July and August 2014, Lunte completed appraisal reports on the Hoke and PMC properties, respectively, utilizing a "sales comparison approach," which involved calculating a "highest and best use estimate" based on the size and characteristics of the respective properties. The highest and best use of a property is "[t]he use which would give the property its highest cash market value as of the effective date of value." The sales comparison approach is one of three generally accepted methods to estimate value, and as Lunte explained, it operates in the following manner:

> "[T]he sales comparison approach is a comparison of the property that you're appraising with properties that are comparable to it that have sold, thereby indicating a most probable sale price of the property that you're appraising, based on the *** comparable data. So the *** principle of substitution between properties leads to an indication of value."

¶ 57    Based on zoning, physical characteristics, and the feasibility of supporting a potential use, Lunte determined that the highest and best use of the PMC property was a combination of "agricultural, timber recreation, and pasture." Lunte reiterated that when using the comparable sales approach, "[y]ou're illustrating that these properties have similar characteristics, and you're selecting those and explaining those so you can arrive at your opinion of value." Lunte then testified in detail about the specifics of the seven comparable properties on which he based his appraisal. Lunte valued PMC's property at $9500 per acre for a total value of $632,000.

¶ 58    After determining the overall value of PMC's parcel, Lunte calculated the change in "contributory value" of the permanent easement portion IEPC was acquiring from PMC, which he explained, as follows:

> "[T]he fee estate of the property, which includes all the rights of the property, and that would be the rights included before the easement is impressed, *** which we refer to *** as the bundle of rights, [in] that [a landowner has] the right to use the property unencumbered, you've got the right to rent the property, you've got the right to market and sell it, you can give it away, or you can do nothing with it. *** [The property is] not encumbered by any particular easement or any encumbrances whatsoever. The value of the easement strip after the easement is impressed has reduced rights. There were rights that were acquired from that strip, and so there is an estimate, based on market evidence, what the level or the bundle of rights that are remaining to the property owner, what can the property owner do with that piece of property, based on the loss of rights, and that can lead to the estimate of the value of the area after the easement [has] been impressed."

¶ 59    Lunte valued the permanent easement area before installation of the SAX project—that is, "what does that particular part of the property contribute to the whole property"—at $4000. Lunte estimated a $1500 diminution caused by PMC losing a portion of its bundle of property rights to IEPC. Lunte explained that after installation of the SAX project on PMC's property, the original $4000 value of the permanent easement portion would be reduced to $2500. Lunte clarified that the $1500 diminution represented that portion of PMC's property that "is not a fee simple ownership any more [because] that part of the property is encumbered."

¶ 60    With regard to the temporary easement, Lunte stated that because PMC would only be giving up a portion of its rights for a two-year period, PMC should be reimbursed for the value

of the temporary easement for that time period. Lunte utilized a "fair return to value" methodology, which he described as determining the market value of the temporary easement and then applying a fair rate of return for the two-year term. In his analysis, Lunte used a $13,000 per acre valuation and what he characterized as a generous 8% return on investment. (It is unclear from the record the precise calculations underpinning the $13,000 per acre valuation.) Lunte noted that the temporary easement calculation would result in an approximately $244 valuation ($13,000 per acre x 0.1171 acres x 0.08 rate of return x 2-year term = $243.57). Lunte decided to "round up" the valuation to $500.

¶ 61　　Lunte explained the "damages to the remainder" calculation placed a value on the remaining land that was located outside of the permanent easement. Lunte assigned no value to that category because there was "no change in the highest and best use of the remainder property compared to conditions before the easement."

¶ 62　　As to the Hoke property, Lunte "followed the same appraisal process and methodology through the entire development of the appraisal and reporting" as he had accomplished with the PMC valuation. Lunte opined that the highest and best use of the Hoke property was "agricultural crop production with a residential homestead." Lunte identified 10 comparable properties used for his sales comparison valuation. Lunte then testified in detail to the specifics of the 10 properties on which he based his appraisal. Lunte valued PMC's property at $16,625 per acre for a total value of $1.33 million.

¶ 63　　Lunte opined further that the value of the permanent easement area before installation of the SAX project on the Hoke property was $8500. The damage or diminution due to the Hokes' losing a portion of their bundle of rights to IEPC was $2500. Lunte explained that after installation of the SAX project on PMC's property, the original $8500 value of the permanent easement portion would be reduced to $6000. Lunte then detailed his calculation of the market value of the temporary easement by applying a $14,375 per acre valuation and an 8% return on investment. (It is unclear from the record the precise calculation underpinning the $14,375 per acre valuation.) Lunte's calculation resulted in a valuation that he rounded up to $6000 ($14,375 per acre x 2.5797 acres x 0.08 rate of return x 2-year term = $5933.31). Lunte also found no change in the fair-market value of the remainder of the Hoke property before or after installation of the SAX project.

¶ 64　　Based on his comparable sales approach analysis, Lunte provided the following appraisal summaries:

"PMC Property

| | |
|---|---|
| Fair Cash Value of the Property (66.5 acres x $9500) | $632,000 |
| Fair Cash Value of the Permanent Easement (.3073 acres) | $1500 |
| Fair Cash Market Value of the Property Remainder as Part of the Whole Before the Taking | $630,500 |

- 12 -

| | |
|---|---:|
| Fair Cash Market Value of the Property Remainder After the Taking | $630,500 |
| Damage to the Property | $0 |
| Fair Market Value of the Temporary Easement (.1171 acres) | $500 |
| Just Compensation | $2000 |

The Hoke Property

| | |
|---|---:|
| Fair Cash Value of the Property (66.5 acres x $9,500) | $1,333,000 |
| Fair Cash Value of the Permanent Easement (.5785 acres) | $2500 |
| Fair Cash Market Value of the Property Remainder as Part of the Whole Before the Taking | $1,327,500 |
| Fair Cash Market Value of the Property Remainder After the Taking | $1,327,500 |
| Damage to the Property | $0 |
| Fair Market Value of the Temporary Easement (2.5797 acres) | $6000 |
| Just Compensation | $8500." |

Thereafter, IEPC rested its case-in-chief.

¶ 65                                           2. Voir Dire *of Landowners*

¶ 66       In accordance with its April 2015 ruling, the trial court permitted the parties to *voir dire* Edward and Charles—outside of the jury's presence—to challenge the competency of their lay witness opinions regarding the value of their respective properties.

¶ 67       Edward, who was 69 years old and had been farming for 51 years, testified that he bought the 80-acre parcel of land at issue in 1984. Edward was generally familiar with farm land values in DeWitt County based on his attendance at farm sales and periodic information received from his son, who is a farm manager. Edward's knowledge of soil type and drainage also informed his opinions. Edward provided the following land valuations: (1) his 80-acre

parcel was worth $15,000 per acre, (2) the fair-market value of IEPC's permanent easement was $8700, (3) the fair-market value of IEPC's temporary easement was $19,350, (4) the fair-market value of the remainder portion of his parcel before installation of the SAX project was $1,191,300, and (5) the overall fair-market value of the remainder of his parcel following installation of the SAX project would decrease by 30% to $833,910 (a depreciation of $357,390). Edward opined that the total just compensation for IEPC's interest in his property was $350,000.

¶ 68    Edward acknowledged that (1) he had no land-valuation training, (2) his land-valuation opinions were based on comparable sales that he had received from his son during the previous week, but which he had yet to disclose, (3) his opinion that his land was worth $15,000 per acre did not account for improvements to the land, such as his home or grain facilities, (4) he had not conducted any verification analysis on the real estate sales he relied upon to determine the specific nature of the property sold or the circumstances underlying those transactions, and (5) his opinion that the remainder value of his land would depreciate by 30% was based on a stream of payments for a windmill lease that was not finalized. Edward confirmed that he based a portion of his remainder valuation on the fear and stigma associated with an oil pipeline and the "risks inherently created by the presence of an oil pipeline."

¶ 69    Charles, who was 59 years old and had been farming since he was a "young child," testified that he has farmed the 66½-acre PMC property since 2003. After his mother's death in 2011, Charles and his two sisters owned PMC. Based on his experience farming, Charles provided the following land valuations: (1) PMC's parcel was worth $15,000 per acre, (2) the fair-market value of IEPC's permanent easement was $4609, (3) the fair-market value of IEPC's temporary easement was $878, (4) the fair-market value of the remainder portion of PMC's parcel before installation of the SAX project was $992,850, and (5) the overall fair-market value of the remainder of PMC's parcel following installation of the SAX project would decrease by 30% to $694,995 (a depreciation of $297,855). Edward opined that the total just compensation for IEPC's interest in PMC's land was $303,342. Charles acknowledged that he did not use a sales comparison approach to calculate his aforementioned land value opinions.

¶ 70    Charles based his opinion that the remainder value of PMC's land would depreciate by 30% on the following factors: (1) the risks associated with the construction of the SAX project, (2) interference with his farming operation during construction, (3) the risks inherently created by the existence and presence of an oil pipeline, (4) the fear and stigma associated with an oil pipeline, and (5) safety concerns associated with hydrostatic testing of the pipeline. Charles admitted further that he had no training in land valuation and he did not know what occurs during hydrostatic testing. Charles could not identify a property that sold for $15,000 per acre that was comparable to PMC's property.

¶ 71    Thereafter, the trial court considered arguments regarding the competency of the lay opinion testimony provided by Charles and Edward. Afterward, the court barred Edward and Charles from testifying, finding, in pertinent part, that their lay opinions were based on numerous improper factors that should not have been considered, such as the fear and stigma associated with oil pipelines. The court also noted that Edward and Charles both acknowledged that they were unfamiliar with the technical land-valuation concepts upon which they based their opinions, such as hydrostatic testing and contributory value. In addition, the court noted that many of their respective opinions, such as the 30% depreciation

estimate of the remainder of their respective parcels, were not supported by competent facts.

¶ 72                    3. *IEPC's Oral Motion To Bar Landowners' Valuation Expert*
*and the Trial Court's Ruling*

¶ 73        Immediately thereafter, IEPC moved to bar landowners' controlled expert witness, Michael S. McCann, because landowners had not complied with Illinois Supreme Court Rule 213(g) (eff. Jan. 1, 2007), in that McCann failed to disclose to IEPC the comparable sales he relied upon for his valuation opinions. In support of its oral motion, IEPC tendered to the trial court landowners' December 2014 "Consolidated *** Rule 213(f)(3) Disclosures," which provided, in pertinent part, the following:

> "The subject matter on which [McCann] will testify; the conclusions and opinions *** and the bases therefor[e] are set forth in the attached 'Exhibit F'. [McCann] may additionally testify as to any opinions expressed in his discovery deposition. The qualifications of [McCann] are set forth in the attached professional biography. [McCann] has not prepared any written reports."

(The record reveals that IEPC did not depose McCann.) "Exhibit F" contained a two-page, single-spaced document that provided, in pertinent part, the following:

> "The bases for *** McCann's opinions include: His +30 years of professional experience in matters such as these, his review of the compliant and associated materials, his review of the counterclaim, his knowledge and experience of the appraisal business including accepted practices in the industry, his application of the [Uniform Standards of Professional Appraisal Practice] methods, [his consideration of the facts related to the taking, his consideration of the facts related to the taking], his consideration of lands and easement sales in the Illinois market, associated and/or similar easement transactions, comparable sales, his research and prior experience in appraising utility infrastructure easements, pertinent and relevant market data, his experience as a condemnation commissioner on a pipeline project, consideration of the physical, legal[,] and economic impact of the taking on the remainder property and his other related business experience."

¶ 74        IEPC also tendered to the trial court landowners' January 2015 "Supplemental 213(f)(3) disclosures of *** McCann work file," which provided, in pertinent part, the following:

> "[Landowners] hereby disclose *** McCann's work file including his research and analysis of comparable market data, land sales and easement transactions, historical property value trends, file notes and phone conference with Stenzel property (Livingston) showing a 27.33% pipeline discount, paired sales and other data. The Sales Comparison Approach and an Income Approach was used to analyze [and] cross check the data."

McCann's "work file" was located on a compact disc that held numerous electronic files involving multiple properties in different counties in no discernible order. IEPC represented to the court that the disc contained 7,000 pages of information.

¶ 75        IEPC also provided the trial court a document titled, "Plaintiff's Exhibit 532," which IEPC described to the court, as follows:

> "[T]his is what [IEPC] could extract from the 7,000 pages. This is sales data in many, many counties, hundreds of sales[.] *** [I]n DeWitt County alone there are 178 sales."

- 15 -

¶ 76      After considering further argument, the trial court ruled as follows:

"The purpose of pretrial discovery, including Rule 213(f)(3), is to provide *** information *** to the other side and to avoid surprise. *** [I]t's been represented that back on *** January [2015, landowners] delivered to [IEPC's] office 7,000 pages. Well, that would be no help at all. Is there some indication of what *** pages [McCann was] using for the DeWitt County comparables. From what the [court has] heard, it didn't appear there was. [IEPC] presents *** exhibit 532, *** which includes *** 178 sales. There's no foundation of which [sales McCann was] relying on ***, and that's no help either."

The court barred McCann from testifying, finding that landowners had failed to timely disclose the specific comparable sales McCann used to formulate his valuation opinions.

¶ 77                    4. *The Trial Court's Directed Verdict Findings*

¶ 78      Following a recess, landowners rested their case-in-chief. Immediately thereafter, IEPC moved for directed verdicts on its condemnation suits. Following argument, the court granted (1) a directed verdict in IEPC's favor and (2) compensation of $8500 in case No. 14-ED-3 and $2000 in case No. 14-ED-4 to landowners.

¶ 79      This appeal followed.

¶ 80                            II. ANALYSIS

¶ 81      Landowners' claims concern the following two distinct issues: (1) IEPC's condemnation suit, which includes the trial court's evidentiary rulings at the May 2015 condemnation hearing, and (2) the court's denial of landowners' traverse motions. Prior to addressing the merits of those claims, we first explain the unusual procedural posture of this appeal.

¶ 82                    A. The Procedural Posture

¶ 83      As we earlier noted, the planned SAX project traversed 679 tracts of land located in the counties of Livingston, McLean, DeWitt, Macon, Shelby, Christian, Fayette, and Marion. While the parties' appeal in the instant case was pending before this court, we decided *Kuerth*, 2016 IL App (4th) 150519, 69 N.E.3d 287. In *Kuerth*, Livingston County landowners challenged IEPC's authority to condemn a portion of their respective properties for the SAX project. In December 2016, this court *sua sponte* directed the parties in the instant case to file supplemental briefs consistent with the views we expressed in *Kuerth*. The parties have done so. In the interest of brevity, we briefly summarize *Kuerth* to provide context.

¶ 84                    B. This Court's Decision in *Kuerth*

¶ 85      In *Kuerth*, we considered the propriety of the trial court's rulings regarding (1) evidentiary matters prior to the condemnation proceeding and (2) the denial of the landowners' traverse motions, in which the landowners sought to challenge IEPC's interest in condemning a portion of their property to install the SAX project. *Id.* ¶ 85.

¶ 86      As to the trial court's evidentiary ruling, we rejected the landowners' specific argument (among many presented) that the court abused its discretion by barring the landowners' testimony concerning just compensation (*id.* ¶ 95).

- 16 -

¶ 87    Prior to reaching the merits of the trial court's rulings on the landowners' traverse motions, we briefly discussed the rationale underpinning the legislature's January 2007 repeal of article VII of the Code of Civil Procedure (Pub. Act 94-1055, § 95-1-5 (eff. Jan. 1, 2007) (repealing 735 ILCS 5/7-101 to 7-129)), which had previously governed eminent-domain proceedings, and its replacement, the Eminent Domain Act (735 ILCS 30/1-1-1 to 99-5-5 (West 2014)). *Kuerth*, 2016 IL App (4th) 150519, ¶ 125, 69 N.E.3d 287. We noted that the Eminent Domain Act added a new provision, section 5-5-5(c), which stated, in pertinent part, the following:

" 'Evidence that the [Commission] has granted a certificate or otherwise made a finding of public convenience and necessity for an acquisition of property (or any right or interest in property) for private ownership or control (including, without limitation, an acquisition for which the use of eminent domain is authorized under the Public Utilities Act ***) to be used for utility purposes creates a rebuttable presumption that such acquisition of that property (or right or interest in property) is (i) primarily for the benefit, use, or enjoyment of the public and (ii) necessary for a public purpose.' " *Id.* (quoting 735 ILCS 30/5-5-5(c) (West 2014)).

¶ 88    This court then discussed the operation of rebuttable presumptions in civil proceedings and the amount of evidence required to rebut a presumption. *Id.* ¶¶ 131-33. We noted that in addition to typical presumptions, which require "sufficient" evidence to rebut, trial courts have occasionally imposed a greater burden of production upon a party challenging a presumption, which is sometimes referred to as a strong presumption. *Id.* ¶ 133. "Due to compelling policy considerations, a party challenging a strong presumption must present clear and convincing evidence to rebut the presumption." *Id.* ¶ 134. From that premise, we then outlined the rationale underlying this court's holding that the Commission's determinations were entitled to strong deference, which could be rebutted only with clear and convincing evidence to the contrary. *Id.* ¶ 138. Specifically, we held, as follows:

"[T]he Commission, having been vested with authority by the legislature to resolve the technical issues that come before it, and presumably possessing the expertise to do so, should similarly be accorded deference with regard to the issues concerning the construction of a pipeline in this state. Deeming the Commission's findings worthy of a strong presumption is merely an acknowledgment of that expertise and would serve as a caution to trial courts to not easily disregard the findings of the Commission. Strong public policy favors that the landowners should be required to present clear and convincing evidence before the applicable rebuttable presumptions burst." *Id.* ¶ 140.

¶ 89    Although not statutorily mandated, we held further that the Commission's determination that IEPC had negotiated in good faith with landowners, which was also based on the Commission's presumed expertise in determining whether to grant an entity eminent-domain authority, warranted "substantial deference." *Id.* ¶ 148.

¶ 90    In *Kuerth*, we concluded that the court's denial of the landowners' traverse motions effectively deprived them of the ability to (1) rebut the aforementioned statutory presumptions and (2) refute the Commission's determination that IEPC had negotiated in good faith. *Id.* In so concluding, we vacated the trial court's denial of the landowners' traverse motions and remanded the matter back to the trial court for the limited purpose of conducting a proper traverse hearing. *Id.* ¶ 151. We then provided authority for our decision to retain jurisdiction of the matters presented despite our remand. *Id.* ¶¶ 154-58.

¶ 91    We reaffirm our holding in *Kuerth*, and because we find the facts presented in the instant case strikingly similar to the traverse proceedings that occurred in *Kuerth*, we deem *Kuerth* applicable to the claims raised in this appeal.

¶ 92                              C. IEPC's Condemnation Suit

¶ 93    In their original brief to this court, landowners argued that the trial court abused its discretion by barring (1) landowners' testimony regarding just compensation, (2) evidence about other potential dangers associated with the SAX project, (3) certain witnesses from testifying, and (4) McCann's valuation opinions. Landowners also argued that the court's directed verdict in IEPC's favor was not supported by sufficient evidence. As noted previously, in December 2016, we essentially asked landowners to revisit their initial arguments in light of *Kuerth*.

¶ 94    In their supplemental brief, landowners assert that, with the exception of their arguments concerning their respective just compensation testimony and McCann's valuation opinions, the remaining issues they initially raised challenging the May 2015 condemnation proceeding "in subject and trial court reasoning, have little to distinguish themselves from the virtually identical issues addressed by the [appellate] court in *Kuerth*. Thus, landowners will not address those issues therein." Instead, landowners posit that the court's barring of their just compensation testimony and McCann's valuation opinions "are distinct enough in facts and what rulings were made at the trial court level that landowners believe the analysis in *Kuerth* is not particularly applicable here." Accordingly, we confine our analysis to those two evidentiary issues.

¶ 95            1. *The Trial Court's Determination To Bar Landowners'*
                          *Just Compensation Testimony*

¶ 96                          a. The Standard of Review

¶ 97    " 'Generally speaking, evidentiary motions, such as motions *in limine*, are directed to the trial court's discretion. A trial court's ruling on such motions will not be disturbed on review absent an abuse of that discretion.' " *In re Leona W.*, 228 Ill. 2d 439, 460, 888 N.E.2d 72, 83 (2008). "The threshold for finding an abuse of discretion is high. A trial court will not be found to have abused its discretion with respect to an evidentiary ruling unless it can be said that no reasonable [person] would take the view adopted by the court." *Id.*

¶ 98                    b. Landowners' Just Compensation Testimony

¶ 99    Landowners argue that the trial court abused its discretion by barring their testimony concerning just compensation. We disagree.

¶ 100    Landowners note correctly that a property owner is permitted to testify generally to the value of their property, provided a proper foundation is established. See *Department of Transportation v. White*, 264 Ill. App. 3d 145, 151-52, 636 N.E.2d 1204, 1209 (1994) (citing *Department of Transportation v. Harper*, 64 Ill. App. 3d 732, 735, 381 N.E.2d 843, 846 (1978) (a landowner is generally qualified to express an opinion as to value of their land, but mere ownership is not enough unless the landowner is familiar with facts which give the property value)). In their supplemental brief to this court, however, landowners contend—without citation to any binding or even persuasive authority—that "if the factors considered improper

are determined to be inappropriate topics for testimony in front of a jury, discussion of such topics can be barred without being used to bar *** landowners from stating their valuation opinions entirely." We reject landowners' assertion because, simply put, it is inconsistent with long-established judicial precedent directly addressing this issue.

¶ 101 Over five decades ago, the supreme court held that "where a witness has considered improper elements of damage, his testimony will be deemed incompetent *** even though in part based upon proper elements." *Trunkline Gas Co. v. O'Bryan*, 21 Ill. 2d 95, 100, 171 N.E.2d 45, 48-49 (1960). This proposition of law remains valid. See *Department of Transportation v. Rasmussen*, 108 Ill. App. 3d 615, 625, 439 N.E.2d 48, 56 (1982) ("Where a witness has considered improper elements of damage, his testimony will be deemed incompetent, even though in part based upon proper elements."); see also *Enbridge Energy, Ltd. Partnership v. Fry*, 2017 IL App (3d) 150765, ¶ 56 (citing *Trunkline*, 21 Ill. 2d at 100, 171 N.E.2d at 48-49, approvingly for the proposition that "the [valuation] testimony of a witness, who had considered an improper element of damage, would be deemed incompetent").

¶ 102 We agree with the trial court that Edward and Charles based their valuations on numerous improper factors. These inappropriate factors included the fear and stigma associated with oil pipelines and the unfounded speculation that hydrostatic testing—a technical process with which landowners admitted during *voir dire* they were not familiar—would pose unspecified safety concerns. Accordingly, we conclude that the trial court was well within its discretion to view landowners' testimony as incompetent and, thus, to bar its admission.

¶ 103                           2. *The Trial Court's Determination To Bar*
                                    *McCann's Expert Testimony*

¶ 104 Landowners argue that the trial court abused its discretion by barring McCann's valuation testimony. We disagree.

¶ 105 " 'A trial court's decision regarding whether an opinion has been adequately disclosed such that it may be admitted into evidence is reviewed applying the abuse-of-discretion standard.' " *Fakes v. Eloy*, 2014 IL App (4th) 121100, ¶ 65, 8 N.E.3d 93 (quoting *Prairie v. Snow Valley Health Resources, Inc.*, 324 Ill. App. 3d 568, 576, 755 N.E.2d 1021, 1029 (2001)).

¶ 106 In this case, landowners sought to solicit testimony from McCann as a controlled expert witness under Rule 213(f)(3), which provides, in pertinent part, as follows:

> "For each controlled expert witness, the party must identify: (i) the subject matter on which the witness will testify; (ii) the conclusions and opinions of the witness and the bases therefor; (iii) the qualifications of the witness; and (iv) any reports prepared by the witness about the case." Ill. S. Ct. R. 213(f)(3) (eff. Jan. 1, 2007).

¶ 107 Rules of the Illinois Supreme Court are not mere suggestions but, instead, have the force of law and should be considered in the same manner as statutes. *In re Danzel W.*, 237 Ill. 2d 285, 294, 930 N.E.2d 974, 980 (2010). "The supreme court's underlying policy in crafting Rule 213 concerned not only its efforts to 'manage the complex and important process of discovery,' but also its efforts to 'avoid surprise' and 'tactical gamesmanship.' " *Fakes*, 2014 IL App (4th) 121100, ¶ 65, 8 N.E.3d 93 (quoting *Sullivan v. Edward Hospital*, 209 Ill. 2d 100, 109-10, 806 N.E.2d 645, 652 (2004)). "The importance of a party's compliance with Rule 213(f)(3) is shown by Rule 213(g), which provides, in pertinent part, as follows: 'The information

disclosed in [an] answer to a Rule 213(f) interrogatory *** limits the testimony that can be given by a witness on direct examination.' " *White v. Garlock Sealing Technologies, LLC*, 373 Ill. App. 3d 309, 323, 869 N.E.2d 244, 255 (2007) (quoting Ill. S. Ct. R. 213(g) (eff. July 1, 2002)).

¶ 108    In July and August 2014—after landowners failed to respond to its offers—IEPC filed the condemnation suits at issue, seeking to obtain right-of-way and easement interests in landowners' respective properties and to determine just compensation for both interests. Indeed, the only goal in a partial condemnation—such as this one—"is to provide compensation that is 'just' in the sense that it places the landowner in the same economic position after the condemnation as before." *Koke Mill*, 312 Ill. App. 3d at 904, 728 N.E.2d at 785. Given the technical and particularized process employed to calculate the just compensation that a condemnor should provide for its interest in a condemnee's property, a condemnation proceeding essentially becomes a contest on the credibility of the parties' experts.

¶ 109    In December 2015, when landowners filed their consolidated Rule 213 disclosures, they included two "calculation forms" outlining McCann's just compensation figures. McCann estimated that just compensation for the Hoke property was $269,473, with the following notation: "Excluding house on the tract at this time. Will seasonably supplement." For PMC's property, McCann calculated just compensation at $140,513. Landowners also disclosed a two-page document, in which McCann affirmed that his just compensation valuations were based, in part, on comparable sales. However, McCann did not provide any comparable sales data.

¶ 110    In January 2015, a few months before trial, landowners supplemented the initial Rule 213 disclosures with McCann's "work file," stating that the file included McCann's "research and analysis of comparable market data, land sales[,] and easement transactions." Our review of that file shows no reasonable way to identify or even deduce the specific sales comparison data McCann used to calculate the fair-market values for landowners' respective properties.

¶ 111    Landowners argue that if IEPC was not satisfied with their Rule 213 disclosures, it had several options to obtain the specific information it sought. In this regard, landowners contend that IEPC's lack of diligence in (1) deposing McCann, (2) requesting additional discovery, or (3) filing additional pretrial motions "is against the spirit of the discovery rules." In support of their claim, landowners direct our attention to the Fifth District Appellate Court's decision in *Brdar v. Cottrell, Inc.*, 372 Ill. App. 3d 690, 867 N.E.2d 1085 (2007). For the reasons that follow, we do not find *Brdar* persuasive.

¶ 112    In *Brdar*, the defendant sought to bar testimony from the plaintiff's expert, challenging the adequacy of the plaintiff's disclosures pertaining to the expert's expected testimony. *Id.* at 700, 867 N.E.2d at 1095. In rejecting defendant's claim and affirming the trial court's ruling permitting the expert to testify, the Fifth District provided the following rationale:

> "Even assuming the disclosures were untimely or inadequate, there was ample time for [defendant] to object promptly and seek fuller disclosure in time to prepare to respond to [the expert's] testimony at trial. [Defendant] made no attempts to do so prior to the original trial setting in this matter ***." *Id.* at 701, 867 N.E.2d at 1096.

The court continued, as follows:

"[Defendant] never sought an order to compel a more detailed disclosure, waiting instead until after the original trial setting had been continued *** to seek to exclude [the expert's] testimony instead. This is the very type of tactical gamesmanship the discovery rules are meant to discourage." *Id.*

¶ 113    In *Department of Transportation v. Crull*, 294 Ill. App. 3d 531, 690 N.E.2d 143 (1998)—a case involving the trial court's ruling to permit the jury to consider a previously undisclosed opinion—this court concluded, as follows:

"[W]e reject the trial court's implication that the Department's counsel acted in bad faith by not moving to strike this evidence prior to trial. ***

The Department's counsel admitted that she knew before trial that the cost-to-cure method was generally inadmissible as a basis for determining fair market value of a condemned property. *** We decline to impose upon counsel any legal, moral, or professional obligation of any kind to inform her opponent of weaknesses in the opponent's case, witness, or proposed evidence. Neither Illinois law nor professional ethics require an attorney to advise his or her opponent of such deficiencies or how to present his or her case." *Id.* at 538, 690 N.E.2d at 147-48.

¶ 114    Nine years later, in *Garlock*, 373 Ill. App. 3d at 324, 869 N.E.2d at 256, this court reaffirmed *Crull*, stating as follows:

"In *** *Crull*, [294 Ill. App. 3d at 538-39, 690 N.E.2d at 148], this court addressed the then-newly revised version of Rule 213 and wrote the following:

'Rule 213 establishes more exacting standards regarding disclosure than did Supreme Court Rule 220 [citation], *** which formerly governed expert witnesses. Trial courts should be more reluctant under Rule 213 than they were under former Rule 220 (1) to permit the parties to deviate from the strict disclosure requirements, or (2) not to impose severe sanctions when such deviations occur. Indeed, we believe one of the reasons for new Rule 213 was the need to require stricter adherence to disclosure requirements.'

In *Sullivan*, the supreme court quoted this portion of our decision in *Crull* and wrote, 'We agree.' *Sullivan*, 209 Ill. 2d at 110, 806 N.E.2d at 652."

¶ 115    We adhere to our decisions in *Crull* and *Garlock* and reject landowners' argument that IEPC was under some obligation to ensure landowners' compliance with the clear requirements established by Rule 213 to disclose the conclusions, opinions, and more important, the bases for McCann's valuations. To hold otherwise would provide a perverse incentive to disregard the strict disclosure requirements of Rule 213 and encourage the type of tactical gamesmanship that occurred in this case. Accordingly, we reject landowners' arguments that the trial court abused its discretion by barring McCann's valuation testimony. See *Maggi v. RAS Development, Inc.*, 2011 IL App (1st) 091955, ¶ 61, 949 N.E.2d 731 (a trial court abuses its discretion if (1) it acts arbitrarily without the employment of conscientious judgment, (2) it exceeds the bounds of reason and ignores recognized principles of law, or (3) no reasonable person would take the position adopted by the court).

¶ 116    To the extent that *Brdar* holds otherwise, we decline to follow it. We also note that *Brdar* involved a situation in which the appellate court *affirmed* the exercise of the trial court's discretion regarding the appropriateness of an expert witness' disclosure under Rule 213, the

- 21 -

same action we are taking with regard to the trial court's ruling in this case.

¶ 117                          D. Landowners' Traverse Motion

¶ 118    We previously provided a summary of our decision in *Kuerth*, which we deemed applicable to landowners' claims regarding the November 2014 traverse hearing at issue in this case. In the interest of brevity, we need not revisit (1) the legislature's rationale for enacting a new statutory section to govern eminent-domain issues, (2) the history and operation of rebuttable presumptions, (3) the amount of evidence necessary to rebut the type of presumption at issue, or (4) that the Commission's good-faith finding—which is a prerequisite for granting an entity eminent-domain authority—was entitled to substantial deference from the trial court. For our purposes, it is sufficient to reiterate our overarching holding in *Kuerth*, as follows:

> "Accordingly, based on the aforementioned recitation of the purpose of a traverse hearing and the plain language of section 5-5-5(c) of the Act, we hold that when the Commission granted IEPC a certificate in good standing to construct the SAX project and, later, granted IEPC eminent-domain authority to complete the SAX project, IEPC enjoyed two rebuttable presumptions—that is, that IEPC's interest in landowners' respective properties was (1) primarily for the benefit, use, or enjoyment of the public; and (2) necessary for a public purpose. For reasons that we have already mentioned, in addition to those two rebuttable presumptions, the Commission's determination that IEPC engaged in good-faith negotiations, which was a necessary finding to its grant of eminent-domain authority in IEPC's favor, warrants substantial deference by the trial court. Thus, after filing their respective traverse motions, landowners were entitled to present relevant evidence to rebut and refute, respectively, those three issues." *Kuerth*, 2016 IL App (4th) 150519, ¶ 148, 69 N.E.3d 287.

¶ 119                          1. *The Standard of Review*

¶ 120    When reviewing the denial of a traverse motion, this court considers whether the trial court's determination was against the manifest weight of the evidence. *City of Chicago v. Zappani*, 376 Ill. App. 3d 927, 931, 877 N.E.2d 17, 21 (2007). "Specifically, the manifest weight of the evidence standard is applied to a trial court's finding that a condemnor acted in good faith." *Id.* at 931-32, 877 N.E.2d at 21-22.

¶ 121                          2. *Landowners' Claims of Error*

¶ 122    In their supplemental brief to this court, landowners contend that the trial court erroneously considered the traverse hearing as a motion to dismiss under section 2-619(a)(9) of the Civil Code and consequently denied them the ability to conduct discovery, which, in turn, effectively prohibited their ability to rebut the statutory presumptions and refute the Commission's good-faith determination. In this regard, landowners posit that "the trial court's discovery ruling was reliant on and is inseparable from the question of what [a] proper Traverse procedure is." We agree.

¶ 123    In this case, the trial court denied landowners' request for discovery prior to the traverse hearing, finding that landowners' request was not appropriate. During that hearing, IEPC argued to the court that this court's decision in *Koke Mill* stood for the proposition that a

traverse motion is essentially a motion to dismiss under section 2-619(a)(9) of the Civil Code. In *Koke Mill*, this court affirmed the trial court's denial of Koke Mill's traverse and motion to dismiss because "Koke Mill did not support its [traverse motion] with any evidence of the [City of Springfield's] lack of [a] good faith [offer]." *Koke Mill*, 312 Ill. App. 3d at 908, 728 N.E.2d at 787.

¶ 124    We reject the notion that *Koke Mill* stands for the broad proposition that *all* traverse hearings are akin to a motion to dismiss under section 2-619(a)(9) of the Civil Code. We note that *Koke Mill*, which was decided 7 years before the legislature's January 2007 enactment of the Eminent Domain Act and 15 years before our aforementioned overarching holdings in *Kuerth*, involved the exercise of municipal condemnation powers under article VII of the Civil Code, which has since been repealed. Specifically, *Koke Mill* involved a landowner's challenge to the City of Springfield's power to condemn private property for the public purpose of widening a city road. *Id.* at 902, 728 N.E.2d at 783.

¶ 125    Here, the Commission, with the presumed expertise that it possesses as an agency, exercised its condemnation powers for the purpose of acquiring private property for private ownership and control, which is governed by section 5-5-5(c) of the Eminent Domain Act. See 735 ILCS 30/5-5-5(b), (c) (West 2014) (promulgating different standards when a condemning authority seeks to acquire property for public use versus private use, respectively). We reject IEPC's interpretation of *Koke Mill* and reiterate and reaffirm our holding that a traverse hearing is a limited proceeding that affords a landowner the first and only opportunity to challenge a condemnor's authority and, thus, "is akin to a hybrid proceeding in which specific presumptions must be rebutted by landowners challenging the condemnation filing at issue." *Kuerth*, 2016 IL App (4th) 150519, ¶ 169, 69 N.E.3d 287.

¶ 126    In its supplemental brief to this court, IEPC does not address landowners' specific section 2-619(a)(9) claim, despite its representations to the trial court during the November 2014 hearing. Instead, IEPC responds that (1) the trial court correctly conducted the traverse proceedings in accordance with *Kuerth*, (2) landowners failed to rebut the statutory presumptions of public use and public necessity, (3) landowners "presented nothing" to refute the Commission's determination that IEPC had negotiated with landowners in good faith, and (4) remand is not warranted because landowners are attempting to litigate issues that this court noted in *Kuerth* were "not the proper subjects of a traverse hearing" (*id.* ¶ 164). IEPC misconstrues the narrow issue before us.

¶ 127    Our narrow scope of review concerns whether the trial court afforded landowners their only *opportunity* to challenge the Commission's condemnation powers—specifically, (1) the statutory presumption of public use and public necessity and (2) the substantial deference afforded the Commission's determination that IEPC made good-faith offers to landowners. Thus, the strength of the Commission's presumption or landowners' likelihood of success is of no moment. At the November 2014 hearing, the court denied landowners (1) the opportunity to conduct discovery because it was not appropriate and (2) the ability to call witnesses because it considered the hearing akin to a section 2-619(a)(9) motion to dismiss. Indeed, the court even refused landowners' offer of proof, which merely would have disclosed to the trial court and the opposing party the nature of the offered evidence and would have allowed this court to determine on appeal whether the exclusion of the evidence was proper. *Kim v. Mercedes-Benz, U.S.A., Inc.*, 353 Ill. App. 3d 444, 452, 818 N.E.2d 713, 720 (2004). In so doing, the court

effectively deprived landowners of the opportunity to challenge the condemnation of their respective parcels of land afforded them under section 5-5-5(c) of the Eminent Domain Act.

¶ 128    The following passage from our decision in *Kuerth* fully applies to the instant case:

"The Commission's July 2009 grant of a certificate in good standing and April 2014 grant of eminent-domain authority and the rebuttable presumptions those decisions generated in IEPC's favor were merely the first steps in this process. The trial court's dismissal of landowners' traverse motions effectively deprived landowners of exercising the option of presenting relevant evidence to (1) rebut the presumptions of public use and public necessity that IEPC possessed when it filed its condemnation suit and (2) refute the Commission's determination that IEPC had engaged in good-faith negotiations when the Commission granted IEPC eminent-domain authority." *Kuerth*, 2016 IL App (4th) 150519, ¶ 151, 69 N.E.3d 287.

¶ 129    Accordingly, we vacate the trial court's denial of landowners' respective traverse motions and remand for limited proceedings. As we explained in *Kuerth*, despite vacating the trial court's judgment and remanding for further proceedings, we retain jurisdiction of this appeal. See *id.* ¶¶ 152-58 ("[B]ecause no judgment has been rendered by this court (1) no mandate need issue and (2) this court retains general jurisdiction.").

¶ 130                            E. Directions on Remand

¶ 131    As previously noted, the issues presented in the instant case are similar to those we addressed in *Kuerth*. After this court vacated the trial court's denial of landowners' traverse motions in *Kuerth*, we provided the court comprehensive guidance regarding the appropriate procedure to employ on remand. *Id.* ¶¶ 164-80. Given the length of time and amount of resources already expended in litigating the construction of the SAX project and in the interest of judicial economy and finality, we provide the following directions for remand.

¶ 132                    1. *Limited Scope of the Traverse Hearing*

¶ 133    As previously noted, in July 2014—when IEPC filed its complaints for condemnation against landowners' respective properties—IEPC enjoyed the rebuttable presumptions that its interests in landowners' respective tracts of land were (1) primarily for the benefit, use, or enjoyment of the public and (2) necessary for a public purpose. In addition to those presumptions, the Commission determined that eminent-domain authority in IEPC's favor was warranted because good-faith negotiations between IEPC and landowners had failed. Thus, landowners were entitled to present relevant evidence to rebut these specific presumptions and to refute the good-faith finding. We note, however, that in their respective July and August 2014 traverse motions, landowners disregarded the limited scope of the traverse hearing by attempting to litigate anew the Commission's certification and eminent-domain decisions, which this court affirmed on appeal. In this regard, landowners claim that (1) IEPC is "not properly vested with authority to acquire" their tracts of land, (2) the SAX project did not "constitute a common carrier because of restrictions on access to the proposed pipeline," (3) the Commission's grant of eminent-domain authority did not apply to the current SAX pipeline project, and (4) IEPC did not possess the legal authority to construct the SAX pipeline project. Such issues are not the proper subjects of a traverse hearing, and on remand, the trial court should decline to consider them.

¶ 134   Based on the aforementioned discussion of the proper scope of a traverse hearing, the trial court should consider only two matters on remand, which are landowners' claims challenging (1) the rebuttable presumptions of public use and public necessity and (2) the Commission's determination as to good-faith negotiations, as generally set forth in paragraphs 2 through 6 of landowners' July 2014 traverse motion.

¶ 135                    2. *Discovery and Proceedings on Remand*

¶ 136   Consistent with the limited nature of a traverse motion as well as our limited remand, we direct the trial court to assume control of the discovery proceedings in the instant case by requiring any discovery request to set forth with specificity (1) the information the party seeks, (2) the alleged source of that information, and (3) the relevance of the information sought, given the limited remand in this case. The aforementioned listing, however, does not preclude the court from imposing further discovery requirements.

¶ 137   The trial court should determine whether any discovery sought is appropriate and should deny any request to depose or submit interrogatories that seek information the court deems irrelevant or that already exists in the record or in the possession of the party making the discovery request. If the court determines that discovery—strictly limited to the aforementioned issues—is warranted, it shall actively supervise to ensure discovery occurs in an efficient and expeditious manner.

¶ 138   Given the extensive litigation that has already occurred in this matter and our explicit direction that the trial court conduct an expedited traverse hearing limited to the claims at issue, the court should inquire whether any information sought by landowners through discovery already exists in the public record in this matter. For instance, in *Intervenors II*, in which this court affirmed the Commission's grant of eminent-domain authority to IEPC, John McKay, IEPC's manager of land services, provided detailed testimony about the procedures IEPC employed to identify, contact, educate, and negotiate in good faith the offers IEPC extended to recalcitrant landowners. See *Intervenors II*, 2015 IL App (4th) 140592-U, ¶¶ 23-26 (summarizing McKay's testimony before the ALJ). Landowners, who participated in these proceedings, were permitted to cross-examine McKay. Thus, any claim by landowners that they need to depose McKay to refute the presumption of good faith should be met with skepticism by the court. The court should permit IEPC to challenge landowners' additional requests for discovery by demonstrating that the information sought is either irrelevant to the traverse proceedings or cumulative because the additional discovery sought already appears in the record or is in the possession of landowners or their counsel.

¶ 139   On remand, the trial court should conduct a two-stage traverse hearing. At the first stage, the court should focus solely on whether landowners can present (1) clear and convincing evidence to rebut the presumptions of public use and public necessity and (2) sufficient evidence to refute the substantial deference afforded to the Commission's good-faith determination. If the court determines that landowners have done so, then the court should proceed to the second stage, which would contemplate a further hearing in which the parties could present evidence in support of their respective positions.

¶ 140   We direct the trial court to schedule and otherwise supervise discovery and conduct further proceedings regarding a traverse hearing in an expedited fashion. If, in the court's judgment, landowners fail to (1) rebut the presumptions of public use and public necessity or (2) successfully refute the Commission's good-faith determination, the court should so rule as to

- 25 -

those specific issues, deny landowners' traverse motion, certify the record, and return the matter back to this court. If landowners present sufficient evidence to rebut the presumptions or to refute the good-faith determination, the court should then conduct a further hearing as to those claims on the traverse motion.

¶ 141   If the court finds in favor of one or more landowners, then it should enter an order denying IEPC's condemnation motion as to that landowner or those landowners. Conversely, if the court rules in IEPC's favor following the traverse hearing, it should enter an order to that effect. Regardless of the decision rendered, if a traverse hearing is conducted, the court should again certify the record and return this matter to this court so that we may then resolve this appeal.

¶ 142   If the trial court finds that landowners have overcome the first-stage hurdle, then second-stage proceedings regarding the traverse hearing shall be tried by the court instead of a jury. In this regard, we note that section 10-5-5 of the Eminent Domain Act, which is entitled "Compensation; Jury," states that "[w]hen compensation is so made by the condemning authority, any party, upon application, may have a trial by jury to ascertain the just compensation to be paid." 735 ILCS 30/10-5-5(a) (West 2014). No such provision entitling landowners to a jury determination in a traverse hearing appears in section 5-5-5 of the Eminent Domain Act, which governs traverse hearings and appears immediately preceding section 10-5-5 of the Eminent Domain Act. See *Hamilton v. Conley*, 356 Ill. App. 3d 1048, 1056, 827 N.E.2d 949, 957 (2005) (a tenet of statutory construction provides that if one section of a statute contains a specific provision, the absence of that same provision from a similar section is significant to show a different legislative intent for the statutory sections at issue). Further, our research has disclosed no case in which the issues presented in a traverse motion were resolved by a jury.

¶ 143                    3. *The Timeline on Remand*

¶ 144   As we noted in *Kuerth*, 2016 IL App (4th) 150519, ¶ 177, 69 N.E.3d 287, the appellate court, in other contexts, has remanded a cause to conduct an expedited hearing on a limited issue and imposed specific directions regarding when the trial court was expected to accomplish the appellate court's direction. For example, in *People v. Bohanan*, 243 Ill. App. 3d 348, 612 N.E.2d 45 (1993), this court remanded the matter to the trial court for the limited purpose of conducting an expedited hearing in accordance with *Batson v. Kentucky*, 476 U.S. 79 (1986). In so doing, the appellate court provided the following directions on remand:

> "Upon completion of the preceding steps, the trial court must make both credibility and factual determinations based on the proffered evidence. These findings, including the record, shall be filed with the clerk of this court within 60 days of the filing of this opinion. This court retains jurisdiction for the purpose of reviewing the trial court's determinations pursuant to *Batson*. Both defendant and the State will be permitted to submit supplemental briefs relative to this issue in this court." *Bohanan*, 243 Ill. App. 3d at 352, 612 N.E.2d at 48.

See also *People v. Fellers*, 2016 IL App (4th) 140486, ¶ 36, 77 N.E.3d 994 (while retaining jurisdiction over the case, the appellate court remanded to the trial court for the limited purpose of conducting an appropriate hearing on the defendant's ineffective-assistance-of-counsel claim); *Fleming v. Moswin*, 2012 IL App (1st) 103475-U, ¶¶ 45-46 (while retaining jurisdiction over the case, the appellate court remanded to the trial court for the limited purpose

- 26 -

of conducting a *Batson* hearing within 60 days and requiring the parties to file responses within 14 days of the trial court's ruling on remand).

¶ 145 Unlike *Bohanan*, we prefer to forgo mandating that the trial court conduct the traverse hearing within a specific time frame. Instead, we leave these timing issues to the court's discretion. However, given this court's direction that the trial court should conduct an expedited hearing limited to landowners' traverse motions, we expect that the court will do so at the earliest possible opportunity.

¶ 146 Because we have concluded that the trial court failed to conduct a proper traverse hearing, we vacate the court's traverse order and remand this cause for the limited purpose of conducting an *expedited* traverse hearing in compliance with this court's aforementioned directions. In so ordering, this court retains jurisdiction to review the trial court's ruling following remand. See *People v. Garrett*, 139 Ill. 2d 189, 195, 564 N.E.2d 784, 787 (1990) ("The appellate court is empowered under Rule 615(b) to remand a cause for a hearing on a particular matter while retaining jurisdiction.").

¶ 147 Within 21 days following the trial court's certification of the record to this court, any party who is aggrieved by the trial court's rulings on remand may submit to this court a supplemental brief addressing any issues related solely to those rulings. Thereafter, the opposing party or parties shall have 21 days to file any response. This court will not grant any request for an extension of time to file supplemental briefs. Arguments on issues not directly related to the traverse hearing on remand may not be raised without this court's permission. In due course, this court will issue its decision on all issues raised in this appeal.

¶ 148                                   III. CONCLUSION

¶ 149 For the foregoing reasons, we vacate the trial court's traverse judgment and remand with directions for further proceedings consistent with the views expressed herein.

¶ 150 Vacated; cause remanded with directions.